ERNEST MILLER v. STATE.

No. A-10027.   Jan. 13, 1943.

(133 P. 2d 223.)

Grester H. LaMar, of Guymon, and Person E. Woodall, of Norman, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Geo. M. Frittz, County Atty. of Texas County, of Guymon, for defendant in error.

BAREFOOT, J.    Defendant, Ernest Miller, was charged in the county court of Texas county with a "breach of the peace;" was tried, convicted and sentenced to pay a fine of $150 and to serve 120 days in the county jail; and from this judgment and sentence he has appealed.

This case is one arising out of charges filed against persons known as "Jehovah's Witnesses."   Many appeals

are now pending in this court in cases of this character, and in many of which different issues are raised, and oral arguments have been presented thereon.

This court has recently had under consideration certain cases involving members of this sect. These cases are as follows: Ex parte E. F. Walrod, 73 Okla. Cr. 299, 120 P. 2d 783; Ex parte W. L. Winnett, 73 Okla. Cr. 332, 121 P. 2d 312; Emch v. City of Guymon, 75 Okla. Cr. 1, 127 P. 2d 855.

The last case considered, George L. McKee and Toots Wilson v. State, 75 Okla. Cr. 389, 132 P. 2d 173, involved a question of a breach of the peace, as is involved here. The other cases had reference to certain city ordinances, and did not involve the question of a breach of the peace.

It is considered proper that a short, concise statement of the facts in the instant case be given before the assignments of error are considered.

Defendant was charged by information filed in the county court of Texas county with the crime of a "breach of the peace." The charging part of the information was as follows:

"That the said Ernest Miller, then and there being in said Texas County, State of Oklahoma, on said date of June 5, 1940, did openly, wilfully, wrongfully and unlawfully commit acts by use of opprobrious epithets in the presence of Fred Millard and among divers and sundry persons in said county and state, which said acts and words so spoken did then and there grossly disturb the public peace, in the manner and form as follows, to wit: That the said Ernest Miller stated in the presence of Fred Millard and divers and sundry persons present in the City of Guymon, Texas County, Oklahoma, that he, the said Ernest Miller did not believe in man-made laws; that the only laws he would obey are the laws of Jehovah; that he does not reverence and respect the principles which the flag of the United States represents; that he

will not salute said flag; all of which said open, public and notorious acts, words and conduct of the said Ernest Miller as aforesaid, was calculated to arouse and to anger the said Fred Millard and sundry and divers persons in said Texas County, State of Oklahoma, and did thereby grossly disturb the public peace as aforesaid, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the State."

The statute under which the Attorney General contends that defendant is charged is Oklahoma Statute 1931, section 1988, O. S. A. (Stat. 1941) Title 21, § 1363, which is as follows:

"Use of language calculated to arouse anger or cause breach of peace.—If any person shall make use of any profane, violent, abusive or insulting language toward or about another person, in the presence or hearing, which language, in its common acceptation, is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault, every such person shall be deemed guilty of a breach of the peace, and, upon conviction thereof, shall be punished by a fine in any sum not to exceed $100.00, or by imprisonment in the county jail not to exceed thirty days; or by both such fine and imprisonment, at the discretion of the court or jury trying the same."

It will be noted that the punishment prescribed by this statute assesses a maximum fine of $100 and imprisonment in the county jail for a period not to exceed 30 days. The punishment assessed by the jury against defendant was a fine of $150 and 120 days in jail, for which judgment and sentence was entered by the court. This punishment, it will be noted, is far in excess of the punishment prescribed by the statute under which the Attorney General contends this prosecution is based. However, the trial court did not instruct the jury upon the statute which the Attorney General contends this prosecution is based; but, instead, instructed the jury with reference to Okla-

homa Statutes 1931, sections 1772, 1768 and 1769, O. S. A. (Stat. 1941) Title 21, §§ 10, 21 and 22, which are as follows:

"§ 10. Except in cases where a different punishment is prescribed by this chapter or by some existing provisions of law, every offense declared to be a misdemeanor is punishable by imprisonment in the county jail not exceeding one year or by a fine not exceeding five hundred dollars, or both such fine and imprisonment."

"§ 21. Where the performance of an act is prohibited by any statute, and no penalty for the violation of such statute is imposed in any statute, the doing of such act is a misdemeanor.

"§ 22. Every person who wilfully and wrongfully commits any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages public decency, and is injurious to public morals, although no punishment is expressly prescribed therefor by this Code, is guilty of a misdemeanor."

The court then, in instruction No. 3, instructs the jury with reference to what constitutes a breach of the peace, and in instruction No. 4 virtually informs the jury that if the defendant used the language as stated in the information he would be guilty of a breach of the peace. Defendant excepted to the giving of this instruction. The last part of this instruction practically instructs the jury to convict the defendant under the evidence offered by the state.

Counsel for defendant, at the conclusion of the state's evidence, demurred to the same and requested a directed verdict. The court, at the time of overruling the demurrer to the evidence, used this language:

"In view of the demurrer offered, the court has to take the evidence offered by the state as true for the purpose of the demurrer. Under this evidence it is disputed,

it is true, but I can see some similarity in the case quoted in the United States Supreme Court and the case we have here. The case there seems to be between different denominations. In the language contained in the information in this court, the language wasn't any language of any denomination, but was against the state and the flag. We have a statute which makes it unlawful to show any indignation toward the United States flag. For this reason it would be an unlawful act. The information charges that the defendant uttered language that would be an indignation against the United States flag, and that would be unlawful.

"There is another reason for which I am forced to overrule the demurrer. There is a question raised as to constitutionality, and our courts have held that it is not good practice for the lower courts to pass upon the constitutionality of the laws. I think that is good law. The Constitution should be obeyed and followed, and every citizen should have his constitutional rights and should not have some inferior court construing his rights under the Constitution, and the appellate courts have laid down that rule, and this court wants to follow it. For these reasons the demurrer will be overruled and exception noted."

The statute to which the court referred when using the language "we have a statute," is 2117, O. S. 1931, Okla. St. Ann. 1941, Tit. 21, § 372, which is as follows:

"Any person who shall tear down, mutilate, deface, defile, defy, treat with indignity, or wantonly destroy the flag or coat of arms of the United States of America, shall be guilty of a misdemeanor."

It will be noted that the maximum punishment provided by this statute is not to exceed a fine of $100 and 30 days in jail. The court in his instructions to the jury did not refer to or mention this section of the statute. From a careful reading of the same we are constrained to believe that it has no application to the facts as revealed by the record in this case. The acts and conduct

of the defendant were not such as constitute a violation of the terms of this statute. That part of the court's statement with reference to passing upon the constitutionality of the statutes by a "Nisi Prius" court was by reason of a decision of this court in the early days, the case of Dalton v. State, 6 Okla. Cr. 85, 116 P. 954, 956, in which it is stated:

"It is a questionable practice for nisi prius courts to take the initiative in holding statutes unconstitutional, and it is a matter of conmmendation that the superior court passed the important question of the constitutionality of this provision of the statute to the appellate courts."

As much may be said in this case. We do not think there is any constitutional question raised which required the serious attention of the lower court or of this court. The only question is the proper consideration and construction of different statutes as applied to the facts.

Enough has been stated to cause a reversal of this case, but the evidence as revealed by the record shows that defendant was a member of a religious group known as "Jehovah's Witnesses." He had lived in Texas county for a number of years and bore a good reputation in that community. On the date charged in the information he came to the city of Guymon for the purpose of distributing literature on the streets. He had a placard on his car with quotations from the Bible. The exact quotation is not revealed by the record. He parked his car on the street and near the place of business of Mr. Claude Hesson, who was friendly to and also a member of "Jehovah's Witnesses." He worked on the streets until about 4 o'clock and returned to his car and found that the placard had been taken therefrom and burned in the street. He did not see and did not know who did this. He went to the shoe repair shop of Mr. Hesson and there found some

50 or 75 people congregated, a number of them on the outside. They were in conversation with Mr. Hesson with reference to the Bible and the teachings of "Jehovah's Witnesses." The defendant approached and was engaged in conversation by those present and a number of questions were asked defendant by the citizens present. These questions were answered by defendant and the answers he gave constitute the basis of the charges against him of a "breach of the peace." There was no fight, no acts of violence, no overt act of any kind, either by the citizens or the defendant, such as existed in the case of George L. McKee and Toots Wilson v. State, supra, decided by this court on the 9th day of November, 1942, 75 Okla. Cr. 389, 132 P. 2d 173. It is only the spoken words by defendant upon which it is relied by the state that there was a breach of the peace. The state offered the evidence of four witnesses as to what transpired. The complaining witness was Fred Millard and he testified to the following statements being made by the defendant:

"Q. Just tell the jury what it was he said. A. Well, he said he didn't believe in man-made laws, and he said he didn't reverence the American flag nor believe in anything that it stood for. * * * Q. Now when he made the statement that you have just related to this jury, did that cause you to become angry? A. Well, I should think that would rile up the people. Q. I asked you if it did cause you to become angry? A. Yes, sir; that is right. Q. Did you say anything to Mr. Miller about that? A. Well, I don't just remember what I said. I think that any man that would make that statement is wrong. * * * Q. Did he speak out, so that other people could hear him? A. He did. * * * Q. Alright, who was there? A. Well, there are four or five witnesses here that I believe were down there, and there were other people there; I can't recall them by name. Q. What witnesses do you mean; do you mean Jehovah's Witnesses? A. No, sir; Mr. Simpson was there, and Jim Degraffenreid, and Mr. Doyle,

and I think Mr. Moorehouse, and I expect there were 50 other people there; I didn't know all of them. * * * Q. Just go ahead and tell us what you said to Hesson. A. There was a bunch of us trying to determine why he took the stand he did against the American Government and the flag. Q. Will you just tell us what you said to him and what you said to Ernest Miller there? A. Part of it would not be very nice to hear here. Q. You don't want to repeat it here? A. No, sir; I don't remember just what I said. * * * Q. Did you hear him say he didn't believe in the American flag? A. He sure did, and furthermore, he said he wouldn't salute the American flag. * * * Q. Was Ernest Miller present at the time the sign was taken off of his car and destroyed? A. I don't know; I don't think he was. * * * Q. Where did you destroy that sign? A. We burned it down there between Nash's and the Magnolia Filling Station."

The testimony of the other witnesses of the state was practically to the same effect. The defendant, testifying in his own behalf, denied making some of the statements. A part of his evidence was as follows:

"* * * Q. Where were you? A. I volunteered in the service the 15th of July, 1918. Q. And did you serve in the army? A. Yes, sir. Q. How long did you serve in the army, Ernest? A. Nine and one-half months. Q. What is your occupation, Ernest? A. I have two occupations. One is that of a farmer, and the other is that of an ordained minister of the gospel. Q. Of what particular group are you an ordained minister? A. Jehovah's Witnesses."

The witness then went into a further account, giving Bible quotations for his beliefs. It is unnecessary to quote from this evidence. He further testified:

"Q. Did you state to one of the parties there that you would not salute the flag? A. I did not. Q. As a matter of fact, you will not salute the flag, will you? A. That answer, I will read to you from the Bible. Q. I don't care anything about you reading from the Bible.

\* \* \*  Q. Now you can answer that question, yes or no? A. No, sir. Q. I will ask you this question; do you believe in man-made laws? A. Yes, sir. Q. Do you obey man-made laws? A. Yes, sir. Q. I will ask you if you believe in the principles that that flag stands for (indicating flag on wall)? A. Yes, sir; that flag stands for liberty and justice, freedom of worship and freedom of speech and freedom of the people. It stands for that and I believe in it. Q. You understand that the Bill of Rights of the United States gives a man the right of freedom of speech, do you? A. I sure do."

The question here presented is: Were the statements made by the defendant a "breach of the peace" under the statute which defendant was prosecuted? We do not believe that the statute under which the court instructed the jury is applicable to the facts in this case. This is especially true by reason of the section immediately following this section. Oklahoma Statutes 1931, section 1773, O. S. A. (Stat. 1941), Title 21, § 11, and which is as follows:

"If there be in any other chapter of the laws of this state a provision making any specific act criminal and providing the punishment therefor, and there be in this Penal Code any provision or section making the same act a criminal offense or prescribing the punishment therefor, that offense and the punishment thereof, shall be governed by the special provisions made in relation thereto, and not by the provisions of this Penal Code."

If, as contended by the Attorney General, Oklahoma Statutes 1931, section 1988, O. S. A. (Stat. 1941), Title 21, § 1363, is applicable, we have a specific criminal statute and one which prescribes the punishment which is different from the punishment prescribed by the statute under which the court instructed the jury that this prosecution was based. If the Attorney General is right in his contention that the prosecution was based upon the stat-

438

ute above indicated, it was then error for the court to instruct the jury under the statute heretofore quoted, for the very good reason that this was a specific statute covering this offense, and the statute under which the court instructed the jury was only applicable when there was no such statute under which a defendant could be specially prosecuted; and as heretofore stated, the punishment inflicted by the statute under which the court charged the jury provides a more excessive penalty than the statute under which the Attorney General contends this prosecution is based. It is clear to us that the terms of the statute under which the court charged the jury has no application to the facts as revealed by the record. Thomas v. State, 38 Okla. Cr. 379, 262 P. 503; Hayes v. State, 22 Okla. Cr. 99, 210 P. 728; State v. Bunch, 23 Okla. Cr. 388, 214 P. 1093.

Defendant has filed an elaborate brief, in which it is contended that the court erred in refusing to give certain requested instructions, and with reference to defendant being denied certain constitutional rights under the due process clause of the Fourteenth Amendment to the United States Constitution, and under article 1, sec. 2, of the Constitution of this State. We do not consider it necessary in view of what has heretofore been said to discuss these questions at length. Other cases pending in this court, and in which these issues are more clearly raised, will be decided at an early date. We do not believe that the words here used by defendant were sufficient to constitute a breach of the peace. While one may not agree that the defendant is right in his thought, or that he is right in the construction he has placed upon different verses of the Bible with reference to saluting the flag of his country, yet under our democratic government and the Constitution of the United States and the

Constitution of this state, he has the right to these thoughts, and under the decisions of the Supreme Court of the United States, and of this state, he has the right to these beliefs. Of course, he does not have a right to violate the laws of this state by overt acts or by a breach of the peace, and if he does so it is at his own peril. Here the defendant committed no over tact. Most of his statements were in answer to questions propounded by citizens who had gathered.

The Supreme Court of the United States in the case of Jesse Cantwell et al. v. State of Connecticut, 310 U. S. 296, 60 S. Ct. 900, 903, 84 L. Ed. 1213, 128 A.L.R. 1352, decided in May, 1940, has reviewed a case in which the facts are very similar to those in the case at bar.

In that case the defendant, Jesse Cantwell, and others who were members of Jehovah's Witnesses, were charged on different counts. The fifth count charged a breach of the peace. Jesse Cantwell was convicted in the lower court on the fifth count, and appealed to the Supreme Court of the United States. The facts with reference to this count are that the defendant Jesse Cantwell stopped two men in the street, asked, and received, permission to play a phonograph record, and played the record "Enemies," which attacked the religion and church of the two men, who were Catholics. Both were incensed by the contents of the record and were tempted to strike Cantwell unless he went away. On being told to be on his way he left their presence. There was no evidence that he was personally offensive or entered into any argument with those he interviewed. Nor were there any overt acts on the part of the defendant or either of the parties approached.

The lower court held that the charge was not an assault or breach of the peace or threats on Cantwell's part,

but invoking or inciting others to breach of the peace, and that the facts supported the conviction of that offense.

The Supreme Court in an opinion by Justice Roberts, reviewing the facts as above outlined, said:

"No one would contest the proposition that a state may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. It is equally clear that a state may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment. The appellants are right in their insistence that the act in question is not such a regulation. * * *

"We hold that, in the circumstances disclosed, the conviction of Jesse Cantwell on the fifth count must be set aside. Decision as to the lawfulness of the conviction demands the weighing of two conflicting interests. The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited and that freedom to communicate information and opinion be not abridged. The state of Connecticut has an obvious interest in the preservation and protection of peace and good order within her borders. We must determine whether the alleged protection of the state's interest, means to which end would, in the absence of limitation by the federal Constitution, lie wholly within the state's discretion, has been pressed, in this instance, to a point where it has come into fatal collision with the overriding interest protected by the federal compact.

"Conviction on the fifth count was not pursuant to a statute evincing a legislative judgment that street discussion of religious affairs, because of its tendency to provoke disorder, should be regulated, or a judgment that the playing of a phonograph on the streets should in the interest of comfort or privacy be limited or prevented.

Violation of an act exhibiting such a legislative judgment and narrowly drawn to prevent the supposed evil, would pose a question differing from that we must here answer. * * *

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious. Equally obvious is it that a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application."

This language has specific application to the facts as revealed by the record in the instant case. From that record we cannot say that the answers to the questions made by the defendant presented a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." The court further says:

"Having these considerations in mind, we note that Jesse Cantwell, on April 26, 1938, was upon a public street, where he had a right to be, and where he had a right peacefully to impart his views to others. There is no showing that his deportment was noisy, truculent, overbearing or offensive. He requested of two pedestrians permission to play to them a phonograph record. The permission was granted. It is not claimed that he in-

tended to insult or affront the hearers by playing the record. It is plain that he wished only to interest them in his propaganda. The sound of the phonograph is not shown to have disturbed residents of the street, to have drawn a crowd, or to have impeded traffic. Thus far he had invaded no right or interest of the public or of the men accosted.

"The record played by Cantwell embodies a general attack on all organized religious systems as instruments of Satan and injurious to man; it then singles out the Roman Catholic Church for strictures couched in terms which naturally would offend not only persons of that persuasion, but all others who respect the honestly held religious faith of their fellows. The hearers were in fact highly offended. One of them said he felt like hitting Cantwell and the other that he was tempted to throw Cantwell off the street. The one who testified he felt like hitting Cantwell said, in answer to the question 'Did you do anything else or have any other reaction?' 'No, sir, because he said he would take the victrola and he went.' The other witness testified that he told Cantwell he had better get off the street before something happened to him and that was the end of the matter as Cantwell picked up his books and walked up the street."

The facts are very much like the facts in the instant case. Here, the defendant Miller offered no abusive words, he simply answered the questions propounded by the citizens who had assembled before he came in their presence. These answers were based upon his individual religious beliefs, and though he may have been wrong in the opinion of others, he had the right, under the Constitution as interpreted by the Supreme Court of the United States to have and express his private opinion based upon his religious beliefs. All of the witnesses testified that no overt act, and no abusive language towards others was used by the defendant. His own testimony showed that he believed in the principles for which the flag stands;

that he had been a former service man in World War No. 1. Certainly the facts in the instant case are almost identical with the facts in the Cantwell case.

The court in that case further said:

"Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace. One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

"We find in the instant case no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion.

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy. * * *

"Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the state, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.

"The judgment affirming the convictions on the third and fifth counts is reversed and the cause is remanded for further proceedings not inconsistent with this opinion."

It has universally been the tendency of this court to follow the decisions of the Supreme Court of the United States upon questions involving the construction of the Constitution of the United States. We deem it important to do so at this time.

To our mind, the facts in the instant case are almost identical with the facts in the Cantwell case. While we may not agree with his thoughts, yet, under the Constitution as interpreted by the Supreme Court of the United States, he has the right to that thought, and his expression of the same in a proper manner, as a part of his religious belief, may not be considered as a violation of a statute, especially as the one under which this defendant was charged and convicted.

The punishment inflicted by the jury in the instant case is out of proportion to the acts committed by this defendant. As heretofore announced, the statute under which the court instructed the jury has no application to the facts in this case. While citizens have served their country, and have given of their life's blood for the principles for which it stands, yet our Constitution and our democracy are based upon freedom of speech, freedom of the press, and the right to worship God according to the

dictates of our own conscience. This defendant may be wrong, in the opinion of the court, in the principles for which he stands, and his manner of strict construction of certain verses of the Bible, but the principles which are applied by the dictator nations of the world should not be applied here. We should rather hope that the sacrifices of blood and lives of the young men of this country will be a lesson which may bring this defendant and those with whom he is associated to their senses and to an appreciation of the flag of this country and for the noble principles for which it stands.

From the oral arguments recently held in this court, we feel that some of the members of this sect are sincere in their belief that it is contrary to the teachings of the Bible for them and their children to salute the American flag. Others, we fear, are joining this organization with the thought in their minds that it will be a shield in preventing their sons from entering the armed forces of this country, to defend its honor in this great hour of peril. If this be true, we realize that the indignation of those men who entered the World War and the citizens of this country would be taxed to the limit. But would it not be better for their organization to proceed in conformity with democratic principles which are a part of the Constitution of the United States, and of this state, than for them to use force or violence in attempting to correct the mistake of others? It may be that when the sons of these members are called to the defense of their country, and called they will be, they will see the error of their way, and they will be able to read the Bible with a clearer understanding that the defense of one's country, and a reverence for its flag, is a basic principle of the Bible, and has always been recognized from the days of Jehovah, the God whom they claim to revere.

446

For the reasons above stated, the judgment and sentence of the county court of Texas county is reversed, with directions that the defendant be discharged.

JONES, P. J., and DOYLE, J., concur.