# HARRY S. EMCH v. CITY OF GUYMON.

No. A-10028.   July 8, 1942.
(127 P. 2d 855.)

2

Grester H. LaMar, of Guymon, for plaintiff in error.

JONES, J. The defendant, Harry S. Emch, was charged in the police court of the city of Guymon with the violation of section 1 of ordinance No. 85 of said city, was convicted and sentenced to pay a fine of $5 and costs. An appeal was taken to the county court of Texas county, trial was had to a jury, a verdict of guilty was returned, and the defendant sentenced to pay a fine of $15 and

costs, from which judgment and sentence an appeal has been taken to this court.

It is the contention of the defendant that the ordinance as applied to him is unconstitutional and invalid.

The section of the ordinance in question provides:

"No person shall distribute newspapers, hand bills, or tracts, or books, within the city limits of the City of Guymon without first securing a written permit from the City Clerk of such City."

Section 4 of said ordinance provides:

"Any person violating any of the provisions of this ordinance shall be deemed guilty of a misdemeanor and upon conviction shall be fined the sum of not less than One Dollar ($1.00) or more than Twenty Dollars ($20.00) for each and every offense."

The complaint charges that the defendant did unlawfully distribute tracts and pamphlets in the city of Guymon without first securing a permit from the city clerk. The proof is substantially as follows:

E. C. Krone testified that he was the city clerk of Guymon and had control and custody of the ordinance books of said city. The ordinance in question was identified and read to the jury. The witness further testified that defendant had never applied nor received a permit to distribute literature and pamphlets or other matter within the city of Guymon and that he made no charge for issuing permits. That he had issued at various times, permits under this ordinance and had on occasions refused to issue permits because of the nature of the articles sought to be distributed.

C. J. Herbstreit, the complaining witness, testified that the defendant, on August 10, 1940, was standing on a corner of Main street in the city of Guymon stopping people and offering literature to them. That the defendant offered to sell the witness some literature which was

identified as "The Watchtower." That defendant had other literature on his person and witness identified the magazine "Consolation" as being other literature which was offered by defendant.

On cross-examination the witness testified that defendant did not argue with the witness nor did he quarrel, nor did he harangue the witness in any way, when he, the witness, refused to receive the magazine.

The defendant testified in his own behalf that he was a resident of Hazelton, Kan., that he was an ordained minister of Jehovah God to preach the gospel of God's kingdom under Christ Jesus and is one of the sect known as Jehovah's Witnesses. He introduced in evidence an instrument in writing by which he was duly ordained as a minister of the gospel to carry on the work of his religious society.

His testimony revealed that it was part of the duty of the members of that religious denomination to preach God's word by calling upon people at their homes and exhibiting to them the message of the gospel in printed form, such as the Bible, books, booklets and magazines, and thus "afford the people the opportunity of learning of God's gracious provision for them."

Defendant further testified that he devoted all of his time to the business of preaching the gospel, by distributing copies of the "Watchtower" and "Consolation" magazines in parts of Texas, Kansas, and northwestern Oklahoma.

Defendant further testified that he was in the city of Guymon on August 10, 1940, and had in his possession copies of said magazines which he was offering to those who were willing to receive them. He offered a copy of the "Watchtower" to the witness Herbstreit, who declined to receive the same. When said offer was declined he

did not press the offer or argue or suggest anything to Herbstreit. Defendant further testified that he always conducted himself in his work in a decorous and dignified manner without argument, without violence, without quarreling, and only placed literature with those who were willing to receive it. That he gladly accepted contributions from persons to whom the literature was offered, but if they did not desire to contribute but would read the magazine, he would donate it to such persons.

An exhaustive brief has been filed with the court supporting the views of the defendant. No one has appeared on behalf of the city of Guymon by argument or brief in support of the ordinance herein involved. If it were not for the great public interest which questions such as this involve, this court would be inclined, in view of the record, to reverse this case because of the failure of any interested party to appear on behalf of the defendant in error. Especially would this be true where only a police court conviction is involved. However, in recent weeks there have been other cases involving this same religious society, and raising fundamental questions which are herein involved, to where it is apparent that a further expression of the court is deemed necessary to fully clarify the controverted questions.

The question herein may be disposed of by reference to two comparatively recent decisions of this court involving similar questions. See Ex parte Walrod, 73 Okla. 299, 120 P. 2d 783, 785, and Ex parte Winnett, 73 Okla. Cr. 332, 121 P. 2d 312. In each of those cases it is stated:

" 'Freedom of the press' as guaranteed by Constitutions, federal and state, is not confined to newspapers and periodicals, but necessarily embraces pamphlets and leaflets, and contemplates not only the right to print, but also the right to distribute."

"The power of municipalities to enact regulations in the interest of the public safety, health and welfare or convenience, may not be so employed as to abridge the individual liberties secured by the Constitution to those who wish to speak, write, print or circulate information or opinion."

"Members of a cult known as Jehovah's Witnesses have a constitutional right to distribute their literature, on streets of city, in an orderly manner, without interference by state authority, in absence of allegation or showing that such literature is against public morals or in any way improper for distribution. U. S. C. A. Const. Amends. 1, 14."

In the case of Lovell v. Griffin, 303 U. S. 444, 58 S. Ct. 666, 667, 669, 82 L. Ed. 949, a similar question to that herein was presented to the Supreme Court of the United States for its judgment. The defendant, in that case, was charged with a violation of an ordinance of the city of Griffin, Ga., which ordinance provided in substance that circulars, handbooks, advertising, or literature may not be distributed in the city of Griffin without first obtaining written permission from the city manager.

The defendant was one of Jehovah's Witnesses. She distributed religious tracts in said city and did not apply for a permit, as she regarded herself as sent "by Jehovah to do His work" and that such an application for a permit would have been "an act of disobedience to His commandment."

In the body of the opinion Chief Justice Hughes stated:

"We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character is such that it strikes at the very foundation of the freedom of the press by subjecting it to license and censorship. The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his

assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish 'without a license what formerly could be published only with one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. See Patterson v. Colorado, 205 U. S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 [881], 10 Ann. Cas. 689; Near v. Minnesota, 283 U. S. 697, 713-716, 51 S. Ct. 625, 630, 75 L. Ed. 1357 [1366-1368]; Grosjean v. American Press Co., 297 U. S. 233, 245, 246, 56 S. Ct. 444, 447, 80 L. Ed. 660 [666, 667]. Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form.

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. What we have had recent occasion to say with respect to the vital importance of protecting this essential liberty from every sort of infringement need not be repeated. Near v. Minnesota [283 U. S. 697, 51 S. Ct. 625, 75 L. Ed. 1357], supra; Grosjean v. American Press Co. [297 U. S. 233, 56 S. Ct. 444, 80 L. Ed. 660], supra; De Jonge v. Oregon [299 U. S. 353, 57 S. Ct. 255, 81 L. Ed. 278], supra.

"The ordinance cannot be saved because it relates to distribution and not to publication. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Ex parte Jackson, 96 U. S. 727, 733, 24 L. Ed. 877 [879]."

In the case of Schneider v. Irvington, 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155, the Supreme Court of the United States, in another case involving Jehovah's Wit-

nesses, extended the doctrine of Lovell v. Griffin. It is therein held:

"A municipal ordinance which prohibits persons in public streets from handing circulars, handbills, etc., to those willing to receive them, the purpose of which is to prevent the littering of a street by persons who after receiving them throw them away, violates the constitutional right of freedom of speech and of the press, even though it is enforced only if those who receive printed matter throw it away in the street, and though its operation is limited to streets and alleys and leaves persons free to distribute printed matter in other public places."

"A municipal ordinance which prohibits canvassing, soliciting, the distribution of circulars or other matter, or calling from house to house, without having first obtained a police permit, the applicant for which is required to furnish certain information and to be finger printed and photographed, and which may be refused on the ground that the applicant is not of good character or is canvassing for a project not free from fraud, the effect of which is to make canvassing from door to door subject to the power of a police officer to determine, as a censor, what literature may be distributed from house to house and who may distribute it, unconstitutionally abridges freedom of speech and of the press secured against state invasion by the Fourteenth Amendment when applied to noncommercial canvassing by one who distributes booklets published by a religious organization and requests contributions for the purpose of printing booklets to be placed in the hands of others."

See, also, Cantwell et al. v. State of Connecticut, 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 128 A.L.R. 1352, Grosjean v. American Press Co., 297 U. S. 233, 56 S. Ct. 444, 80 L. Ed. 660.

Not only does the ordinance in question violate the constitutional guaranty of freedom of the press (section 22 of article 2 of the State Constitution), but it is also

an infringement of section 2, article 1, of the State Constitution, which declares:

"Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; and no religious test shall be required for the exercise of civil or political rights. Polygamous or plural marriages are forever prohibited."

In this country the full and free right to worship God according to the dictates of one's own conscience is granted to every individual, and this court will be steadfast in its protection of these personal guarantees so long as the religious doctrine which is practiced does not violate the laws of morality or property or personal rights which are conceded to all.

It should be pointed out that laws may not be made which will interfere with mere religious beliefs, but such laws may interfere with religious practices. Suppose one believed that he should sacrifice a child as a necessary part of religious worship; it would not be contended that our government could not interfere to prevent such a practice. Our law forbidding plural marriages is directed at a practice which is followed by some religious worshippers. Religious liberty does not include the right to introduce and carry out every scheme and purpose which persons see fit to claim as a part of their religious worship. No one can stretch his liberty so as to interfere with that of his neighbor, or violate police regulations or the penal laws of the land, enacted for the good order and general welfare of all the people.

No municipality and no court of this state has the right to place itself between the individual and Almighty God when such individual is engaged in a conscientious act of worship, unless such individual, by such act of worship, violates the laws of morality or property or per-

10

sonal rights of another, and before the court should interfere it should be plain that the form of worship carried on by the accused is such as to bring it within the prohibition.

We think the ordinance in question as applied to the defendant prohibits his religious worship in the manner his conscience approves. It subjects his work to the approval of the city clerk, who was sitting as an administrative officer. A rabid, intolerant clerk could make it impossible for any minister or priest or religious worker to pass out prayer books, Bibles, or other literature of his denomination, unless such applicants for permits believed as the clerk believed. If such ordinance be upheld as the law of the land, then any municipal council could pass ordinances which would throttle, thwart, and stifle acts of worship and religious teaching.

The city has not appeared before this court, and, as far as the record discloses, no proof was offered in the county court to show that the religious practices complained of were such that infringement on the constitutional guaranty of freedom of the press and freedom of religious worship would be justified to protect the health, safety, or public morals of the people.

The judgment of the county court of Texas county is reversed and the defendant ordered discharged.

BAREFOOT, P. J., and DOYLE, J., concur.