**Albert ETTORE, Plaintiff,**

v.

**PHILCO TELEVISION BROADCASTING CORPORATION and Chesebrough Manufacturing Company, Consolidated, Defendants.**

**Civ. No. 12982.**

United States District Court
E. D. Pennsylvania.

Nov. 23, 1954.

Dilworth, Paxson, Kalish & Green, Harold E. Kohn, and Aaron M. Fine, Philadelphia, Pa., for plaintiff.

Swartz, Campbell & Henry, Herbert A. Barton, and Oscar Brown, Philadelphia, Pa., for defendants.

WATSON, Chief Judge.

The plaintiff, Albert Ettore, a former professional prizefighter, who, on September 22, 1936, fought Joe Louis in Philadelphia, Pennsylvania, instituted

this action against Philco Television Broadcasting Corporation and Chesebrough Manufacturing Company, Consolidated, claiming damages for invasion of his property rights and rights of privacy in that the defendant, Philco Television Broadcasting Corporation, televised over its station WPTZ a motion picture of the plaintiff's fight with Joe Louis. The television of the motion picture film of the fight occurred on December 30, 1949, and on December 8, 1950, on a program entitled "Greatest Fights of the Century", sponsored by the defendant, Chesebrough Manufacturing Company, Consolidated.

An agreed statement of facts, which facts the plaintiff would adduce in his case in chief, with exhibits attached thereto, was filed by the parties.

The following was stipulated by the parties:

"1. Plaintiff, Albert Ettore, is a citizen of the Commonwealth of Pennsylvania residing in Philadelphia.

"2. Defendant, Philco Television Broadcasting Corporation, is a Delaware Corporation, and at the times in question, to wit, December 30, 1949, and December 8, 1950, and at the time of the institution of this suit, was doing business in Philadelphia, Pennsylvania, at the Architects Building, 17th and Sansom Streets, Philadelphia, where it owned and operated television station WPTZ, an independent station affiliated with the National Broadcasting Company, Inc.'s television network.

"3. Defendant, Chesebrough Manufacturing Company, Consolidated, is a New York Corporation authorized to do business in Pennsylvania, with offices at 1421 Chestnut Street, Philadelphia, Pennsylvania.

"4. Paragraph 4 of the complaint alleges that the amount in controversy exclusive of interest and costs exceeds $3000, which allegation defendants deny.

"5. Defendant, Chesebrough Manufacturing Company, Consolidated, is engaged in the manufacture and sale of a hair preparation and other petroleum base products, and for purposes of advertising its products causes to be secured and used all types of advertising media including television programs. This defendant sponsored and secured the production of a certain television program which was entitled 'Greatest Fights of the Century'.

"6. This television program utilized motion pictures of outstanding boxing contests of the past thirty years, which were telecast by the National Broadcasting Company, Inc.'s network. Station WPTZ was an independent station affiliated with said network and the program of the defendant Philco could be viewed in Pennsylvania, New Jersey, Delaware and possibly in other states, under unusual atmospheric conditions.

"Insofar as the defendant, Chesebrough, was concerned, the program was also telecast in New York and elsewhere.

"7. On September 22, 1936, the plaintiff, Al Ettore, fought Joe Louis at Municipal Stadium in Philadelphia. At the time of the fight motion pictures of the said fight were taken with the knowledge and consent of the plaintiff, Ettore. The promoters of the fight were Herman Taylor of Philadelphia, on behalf of Al Ettore, plaintiff in this case, and Michael S. Jacobs, who controlled Joe Louis.

"8. Al Ettore, the plaintiff, was to receive in addition to other provided compensation a twenty percent percentage of all proceeds derived from the sale of motion picture rights in connection with said boxing contest.

"9. The plaintiff, Al Ettore, received the sum of $500, being twenty per cent of the sum of $2,500 paid for the sale of motion picture right to said boxing contest.

"10. The said motion picture film was telecast as set forth above in the manner more fully described hereinafter on December 30, 1949, and December 8, 1950.

"11. The original fight lasted five rounds, and in the 5th round the plaintiff, Al Ettore, was knocked out by Joe Louis. When the film was telecast the third round was deleted, as were also deleted the slow-motion pictures of the knockdown of Al Ettore, plaintiff, in the first round, and also the slow-motion pictures of the knockdown of Al Ettore in the 4th round.

"12. The program 'Greatest Fights of the Century' is a program of fourteen minutes twenty-five seconds duration, of which three minutes is allocated to commercials or advertising. In order to bring the program within the time schedule it is necessary to delete or omit certain portions of the motion picture film.

"13. At the same time that the motion picture film was telecast there was a commentary by Jim Stevenson, who at the end of the 2nd round, as shown on the film, said, 'There's the end of Round 2. In the 3rd round Louis just paces himself. Not too much action. And here we are in Round 4.' This same commentary as to the 3rd round was given at both showings of the film, namely on December 8, 1950, and December 30, 1949. The script of the commentary on the telecast of December 30, 1949, is attached hereto and marked Exhibit B. The script of the commentary on the telecast of December 8, 1950, is attached hereto and marked Exhibit C.

"14. The plaintiff will offer testimony that the 3rd round was his outstanding round, and that he won the 3rd round. The plaintiff will offer further testimony that at the time of the telecast plaintiff told his friends to watch for the 3rd round, which was his outstanding round; that he felt embarrassed after the fight, because the 3rd round was not shown; that it is something he cannot forget about; that he feels like a heel, that he really feels bad; that he wanted them to see that he could fight; but on the television they saw nothing; he was really a bum on television. The next day he went to work at his father's saloon, and the people there derided him, stating, 'What was the matter with the 3rd round? Did you lick that boy?' (Meaning Louis) 'Is that why they didn't show that?' Which left the witness unable to say anything, and the plaintiff will further testify that he really fought pretty good, but after the television show he was shown as 'a bum'; that his friends refused to believe what he had told them and regarded him as a liar and braggart; that as a result of this the plaintiff was humiliated, embarrassed, and pretty well 'burned up'.

"Conceding that the plaintiff, if called, would testify to the above facts, it is contended by both defendants that they are inadmissible on the ground that they constitute self-serving declarations and constitute a violation of the hearsay rule, and that as to any statements by other witnesses not made in the presence of either of the defendants, they are inadmissible in that they violate the hearsay rule.

"15. The plaintiff further contends that the telecast gave a distorted and garbled version of the fight, as will be apparent to anyone viewing the two films which will be offered in evidence—that is, the original film of the fight and the film of the telecast.

"It is the position of the defendants that the omission of the 3rd

round does not constitute a distorted version of the fight; that the film speaks for itself, and that the omission of the 3rd round does not give rise to any legal cause of action.

"16. The plaintiff will further offer testimony that he did not sell his television rights with regard to the fight or the film of the fight or authorize anyone else to sell them on his behalf, and that he did not consent to the telecasts of the motion pictures.

"The defendants will agree that the motion picture films were shown over television without the consent of the plaintiff, the defendants of course contending that no consent was required.

"17. It is agreed that the question of damages is not included in this stipulation and is reserved until after the ruling of the Court, and that the plaintiff is not limited by this stipulation in presenting its case at the trial by additional or further witnesses, in the event that it is ordered that the case proceed to trial; and it is also agreed that the same applies to the defendants."

After the parties filed the stipulation as to all relevant facts to be adduced upon the plaintiff's case, except those as to damages, the defendants moved to dismiss the plaintiff's action under Rule 41 (b) of the Federal Rules of Civil Procedure, 28 U.S.C. Although the procedure herein employed is somewhat unique, the parties to the action agreed that the Court could dispose of the motion without further proceedings in the case on the facts as stipulated. At the hearing on the motion to dismiss there was exhibited in the court room, in the presence of the Judge, the motion picture film of the Louis-Ettore fight as it was portrayed in motion picture theatres some time after the fight. There was also exhibited in the court room, in the presence of the Judge, the televised version of the motion pictures of the fight.

■■ The theory of the defendants' motion to dismiss is that upon the facts and the law the plaintiff has shown no right to relief. An involuntary dismissal should not be ordered, if on the facts it appears that any relief could be granted. Consequently, the facts and all reasonable inferences therefrom must be viewed in the light most favorable to the plaintiff.

The plaintiff first alleges a violation of his right of privacy, both at common law, and under Section 51 of The New York Civil Rights Law, McK.Consol. Laws, c. 6, which provides:

"Any person whose name, portrait, or picture is used within this state for advertising purposes or for the purposes of trade without (such person's) * * * written consent * * * may * * * sue and recover damages for any injuries sustained by reason of such use * *."

■ The suit was brought in the federal court on diversity of citizenship only. The Court takes its law, therefore, from the courts of Pennsylvania. This is the type of case where, if all the questions which could be pointed up by analysis were to be answered, the Court should find itself in a forest from which it would be very difficult to escape. Where was the right of privacy invaded, for instance: Pennsylvania where the plaintiff lived, New York where the telecast emanated, or every state in the Union where the program could be viewed? If so, is there a separate lawsuit for each invasion? Does recovery in one action for one invasion preclude suit in some other state for another invasion? Fortunately, for judicial peace of mind, the Court does not have to face these questions here. The reason the Court is not required to face them is because the authoritative material on the right of privacy has not developed so far that it is confronted with a difference in law of the various states which would necessitate a choice, choosing one rule to be applied and rejecting another. Leverton v. Curtis Publishing Co., 3 Cir., 192 F. 2d 974. The history of the development of the right of privacy is well-known to all students of Tort law. Judge Cooley

first coined the phrase, "right to be let alone".[1]  In 1890 there appeared in the Harvard Law Review a famous article,[2] by Samuel D. Warren and Louis D. Brandeis, following which the right began to be talked by name.  The first state to consider the doctrine thus advanced was New York.  The Court of Appeals in Roberson v. Rochester Folding-Box Company, 1902, 171 N.Y. 538, 64 N.E. 442, 59 L.R.A. 478, rejected the view that there is a common law right of privacy.  But the New York decision has become the minority view.  Courts which have had occasion to pass upon the subject have, for the most part, accepted the right of privacy as an established part of Tort law.  The Restatement states its existence as established.[3]  Likewise have a legion of legal writers; no other tort has received such an outpouring of comment in advocacy of its existence.

The outlines of the right and the privilege to invade it are still dimly marked.  The Court must fashion its decision from the materials at hand without the benefit of an authoritative decision on the exact point involved in Pennsylvania or elsewhere.

■  Certain limitations upon the right, that is, certain privileges to invade the right are recognized today.  The first limitation is found in matters of public interest of a legitimate character.  There are times when one, whether willingly or not, becomes an actor in an occurrence of general or public interest.  When this takes place, he emerges from his seclusion, and it is not an invasion of his right of privacy to publish or show his photograph with an account of such occurrence.  In such a situation the interest in being left alone is overbalanced by the general public interest in being kept informed.

■  Apart from a possible overlapping with the "public interest" category of cases, it is recognized today, as an independent limitation, that people who have in the words of Warren and Brandeis: "renounced the right to live their lives screened from public observation,"[4] have lost the right to complain of certain invasions of their privacy.  Thus, in a situation where a person intentionally puts himself in the public eye, as in the case of a motion picture star,[5] a professional football player,[6] and a professional dancer,[7] the courts have found no actionable invasion of the right of privacy.

Waiver by consent has often been applied in the right of privacy field to defeat recovery.  Here, as in other ramifications of tort law, the consent may be express or implied.

In Chavez v. Hollywood Post No. 43, American Legion, Cal.Super.,[8] a professional boxer alleging a violation of his right of privacy sued to enjoin the television of a match in which he was to engage.  The court denied an injunction.  It held that plaintiff had waived his right of privacy by agreeing to participate in the match.

In Peterson v. KMTR Radio Corp., Cal. Super.,[9] plaintiffs were well known aquatic stars, who performed at a benefit show for charity.  Their contract of employment with the promoter made no mention of television.  Defendant took motion pictures and televised the show without plaintiffs' consent.  Plaintiffs sued defendant upon the theory of an invasion of their right of privacy.  The court held that plaintiffs had waived their right of privacy by putting on the performance.  The court stated:

"A performer or participant in a public, semi-public or private show or event where other persons at-

1.  Cooley, Torts 2d Ed. 1888, 29.

2.  Warren and Brandeis, The Right to Privacy, 1890, 4 Harv.L.Rev. 193.

3.  Restatement, Torts § 867.

4.  See note 2.

5.  Paramount Pictures, Inc., v. Leader Press, Inc., D.C., 24 F.Supp. 1004.

6.  O'Brien v. Pabst Sales Co., 5 Cir., 124 F.2d 167.

7.  Gavrilov v. Duell, Sloane & Pearce, Inc., Sup., 84 N.Y.S.2d 320.

8.  16 U.S.L. Week 2362.

9.  18 U.S.L. Week 2044.

tend thereby waives his right of privacy so far as that performance or event is concerned."

It is the conclusion of this Court that the right of privacy was lost by virtue of plaintiff's performance and further that by reason of being a public figure, the plaintiff cannot claim an invasion of his right of privacy, since the publication in question only pertained to his professional career. This Court further concludes that the immunity from liability is not lost through lapse of time. A subject of public interest can be brought again to public attention later on. Cf. Leverton v. Curtis Publishing Co., supra; Sidis v. F-R Publishing Corporation, 2 Cir., 113 F.2d 806, 138 A.L.R. 15. The right of privacy does not prohibit the publication of matter which is of legitimate public or general interest though no longer current.

Having determined that the plaintiff has no cause of action for violation of his right of privacy at common law, this Court concludes that there is no right of recovery under the Right of Privacy section of the New York Civil Rights Law.

In Gautier v. Pro-Football, Inc.,[10] an animal trainer presented an act at a ball park between the halves of a professional football game. The act was televised in Washington, D. C., and viewed in New York. Suit was brought in New York by the animal trainer for violation of his right of privacy under the New York statute. The animal act was presented pursuant to a contract which did not expressly grant any rights of television. The game was sponsored by a tobacco company which advertised cigarettes during the telecast, and the telecast was made over plaintiff trainer's objection. The lower court held for plaintiff, finding the television showing to have been an unauthorized use of the plaintiff's name and picture for purposes of trade, and therefore actionable under the statute. Upon appeal the Appellate Division held that the television showing was not for purposes of advertising or trade and reversed the judgment, which decision of the Appellate Division was affirmed by the Court of Appeals. It was held that plaintiff's name and picture were not used for "purposes of trade" under the well recognized exception to the New York statute applied to media for the dissemination and propagation of news and information. Like other media of communication, television may have either a trade aspect or an informative or news aspect. In the latter situation, it should be entitled to the same privilege accorded other such media where the New York statutory right to privacy is drawn in issue. It has long been recognized that the use of name or picture in a newspaper, magazine, or newsreel, in connection with an item of news or one that is newsworthy, is not a use for purposes of trade within the meaning of the New York Civil Rights Law.

In affirming the Appellate Division, the Court of Appeals stated:

"Unless plaintiff's name or picture were in some way connected with the 'commercial', the mere fact of sponsorship of the telecast would not, in our opinion, suffice to violate the statute in this respect. Here no such connection was shown, for the commercial announcements were presented at usual and appropriate intervals; it was nothing more than coincidence that one such announcement, made at the close of the first half, occurred immediately prior to his act. He was not connected with the product either by visual, oral or other reference, nor was any issue of fact created by the physical juxtaposition of the single announcement prior to his performance. We conclude, therefore, as did the Appellate Division, that there was no use of plaintiff's name or picture for advertising purposes,

10. 278 App.Div. 431, 106 N.Y.S.2d 553, 557, affirmed by the Court of Appeals in 1952, 304 N.Y. 354, 107 N.E.2d 485, 488.

within the meaning of section 51 of the Civil Rights Law."

As there was here no such exploitation of plaintiff's name or picture, plaintiff cannot recover under this aspect of the Civil Rights Law.[11]

It would seem that plaintiff is also attempting to recover damages because of the omission of the third round in the showing of the movie on television. The plaintiff contends that the television showing by the defendants was an unfair presentation of the fight and that the omission of the third round caused him considerable humiliation because he had told his friends how well he had done and when the round failed to appear, it not only made him look like a liar, but also destroyed the total effect of the fight and failed to give him proper credit for his performance. The telecast was accompanied by a spoken script. At the conclusion of round two, the announcer stated:

"There's the end of round 2. In the 3rd round Louis just paces himself, not too much action. And here we are in round 4."

Plaintiff has cited no case nor has the Court been able to discover any case which would allow the plaintiff to recover damages for the defendants' failure to include round 3 in the telecast. The dialogue accompanying the telecast was merely descriptive and reportorial. The factual presentation was not embellished by any degree of dramatization or fictionalization. The telecast of the fight was exactly as it was portrayed in the motion picture, without variation, unembroidered and unalloyed, with the exception that round 3 was deleted from the telecast and several slow-motion pictures of knockdowns were also deleted. The plaintiff, however, displayed no more ability and skill as a fighter in round 3 than he did in any other round of the fight. If the plaintiff were successful on this phase of his action and such result were carried to its logical conclusion, television stations and networks would be placed in such a precarious position that it would be impossible for them to determine when, what, and how much to televise. The Court, therefore, concludes that upon this phase of his action the plaintiff has shown no right to relief and that the omission of the 3rd round does not give rise to any legal cause of action.

Plaintiff also contends that his property rights were invaded by the defendants when they televised the motion pictures of his fight with Joe Louis. In doing so, plaintiff relies strongly on the decision of Waring v. WDAS Broadcasting Station, Inc., 327 Pa. 433, 194 A. 631, 636.

In the Waring case, Fred Waring, famous arranger and conductor, sued to enjoin a radio station from broadcasting phonograph records of musical compositions played by his orchestra. RCA Victor had made the records, which, when sold to defendant, bore the notice " 'Not licensed for radio broadcast' ". Despite this notice, defendant broadcasted the records and announced them as Fred Waring recordings. An injunction was granted by the Pennsylvania Supreme Court, holding, inter alia, that the performing artist has a property right in his performance.

In a later case, in the United States District Court for the Eastern District of North Carolina,[12] Waring was again successful in obtaining an injunction against the propagation over a radio station of his orchestra's transcriptions, which bore the notice that the records were to be played only on The Ford Motor Program. The court found a property right in the rendition.

On the one hand, we have the two Waring cases upholding such a common law property right in the performing artist.

11. For an excellent discussion of this phase of tort law, see "Televising Old Films—Some New Legal Questions about Performers' and Proprietors' Rights" by Herbert T. Silverberg, 38 Virginia Law Review 615.

12. Waring v. Dunlea, D.C., 26 F.Supp. 338.

On the other hand, there is considerable authority for the proposition that an actor or musician has no common law property interest in his performance and interpretation of a work.

The plaintiff contends that, by analogy, the decision in the Waring case applies to the plaintiff's performance in the instant case. With this, this Court cannot agree. This Court feels that the Waring case is distinguishable from the present case in that here the plaintiff is a professional athlete and, as such, has no property right in his performance. The weakness of plaintiff's position lies in the fact that plaintiff has failed to establish wherein he has any property rights either in the fight itself, the motion pictures of the fight, or the showing of the motion pictures on television. There would be many practical difficulties involved if it were held that contestants in athletic events were deemed to own the broadcasting rights and they had to give in advance their consent to have such event publicized by newspaper, motion pictures, radio and television. Radio and television rights are held by the ball club or promoter and not by the individual player or participant.

Were this Court to hold that a professional athlete has a property right in his performance, then in the case of professional football contests such as are held today, we would have sixty to eighty different persons separately engaged in the sale of radio, motion picture, and television rights. As is well known, they have no such right. They can provide in their contract with the club or promoter that they shall be paid additional compensation if the event is on radio, motion pictures, or television, but in the absence of such contract, they have absolutely no rights of any kind in the radio, motion picture, or television rights.[13]

The defendants' motion to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure on the ground that upon the facts and the law the plaintiff has shown no right to relief will be granted and an appropriate order will be entered herewith.

---

13.  See Chavez v. Hollywood Post No. 43, supra; Peterson, v. KMTR Radio Corp., supra.