Edward Lee LYLES, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12595.

Criminal Court of Appeals of Oklahoma.

Sept. 3, 1958.

Concurring Opinion Oct. 1, 1958.

Gordon L. Patten, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

Lytle, Johnston & Soule, Oklahoma City, amicus curiae.

BRETT, Presiding Judge.

The plaintiff in error, Edward Lee Lyles, defendant below, was charged by information in the District Court of Oklahoma County, Oklahoma, with the crime of burglary in the second degree after former conviction of a felony. He was tried by a jury, convicted, and the jury being unable

to agree on the punishment, left the same to be fixed by the trial court. The trial court assessed the punishment at fifteen years in the state penitentiary. Judgment and sentence were entered accordingly, from which this appeal has been perfected.

In presenting his appeal, the defendant makes numerous assignments of error but presents them in four propositions. First, he contends the trial court committed error in not granting a mistrial for the reason television cameras were permitted in the courtroom, and pictures taken in front of the jury panel were prejudicial to this defendant, and prevented him from having a fair trial. The evidence on this point consists only of proof that television pictures were taken while the court was not in session; that the jury had not been selected; that television pictures were taken during a five minute recess of the court; and that most of the pictures were made of the defendant, some while the jury panel was out of the room and some while it was present, or at least some members of the panel. Upon this showing the trial court overruled the defendant's motion for a mistrial. The defendant objected to the taking of any further pictures and the trial court ordered that no further pictures be taken. The defendant asserts that the newspaper articles and the taking of television pictures gave great weight to the importance of the trial so that the defendant did not receive a fair and impartial trial, all in violation of his constitutional rights, as well as being contrary to Rule 35, Canons of Ethics as promulgated by the American Bar Association, which reads as follows:

"Canon 35. Improper Publicizing of Court Proceedings.

"Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room during sessions of the court or recesses between sessions, and the broadcasting of court proceedings are calculated to detract from the essential dignity of the proceedings, degrade the court and create mis-

conceptions with respect thereto in the mind of the public and should not be permitted.

"Provided that this restriction shall not apply to the broadcasting or televising, under the supervision of the court, of such portions of naturalization proceedings (other than the interrogation of applicants) as are designed and carried out exclusively as a ceremony for the purpose of publicly demonstrating in an impressive manner the essential dignity and the serious nature of naturalization."

The adoption of the canons of ethics by the courts did not give the canons force of law. They are nothing more than a system of principles of exemplary conduct and good character. They are recommended to the bench and bar as patterns which, if adhered to, will promote respect for the bar and better administration of justice. Deupree v. Garnett, Okl., 277 P.2d 168, 175. They are subject to modification to meet the condition of changing times in keeping with the constitutional rights of the people. In re Hearings Concerning Canon 35, Colo., 296 P.2d 465.

In light of the foregoing, the defendant asserts the trial court should have continued the case to a later term, or drawn a new jury panel. This was a matter within the sound discretion of the trial court which we do not find was abused.

In any event, the defendant urges this Court to pronounce a rule concerning courtroom photography in criminal cases in relation to modern media of communication to govern representatives of the press, radio, and televison. In this request he has been joined by the Oklahoma Television Association which has requested and been granted leave to appear herein amicus curiae. There is no precedent in Oklahoma by which to seek direction.

The issues presented on the defendant's first proposition involve important concepts of constitutional law: It is thus apparent that there are certain basic rights involved herein, among which are freedom

of speech and freedom of the press. The right of freedom of speech need not be amplified and supported in this opinion. It suffices that the right may be freely exercised so long as it does not infringe upon or injure the rights of others. It is not an absolute, but rather a relative right. It has been aptly said the right of its exercise does not permit one to yell "fire" in a crowded theatre. Its abuse entails penalties of law provided therefor. But, it is like a twin sister to freedom of the press since they are both modes of communication and so closely allied that we hardly think of one without the other. Both are provided for in the United States Constitution, First Amendment, reading, in part as follows:

"Congress shall make no law * * abridging the freedom of speech, or of the press; · * * *."

Article II, Section 22 of the Constitution of the State of Oklahoma provides:

"Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. * * "

This right belongs to every person. It has been held, freedom of the press as guaranteed by the state and federal constitutions is not confined to newspapers and periodicals, but necessarily embraces pamphlets and leaflets, and contemplates not only the right to print but also the right to distribute. Emch v. City of Guymon, 75 Okl.Cr. 1, 127 P.2d 855. The logic behind this holding is tremendous. Therein it was held that the power to enact regulations may not be so employed to abridge individual liberties secured by the constitution to those who wish to speak, write, print, or circulate information. Under our constitution, the right may be freely used so long as it is not improperly exercised. How can the right of all to gather and disseminate legitimate matter to the public be denied to one without doing violence to the right of all? A

right that belongs to all cannot be denied to the few without risk of destruction of the right. No one will deny the long established right of the press in the United States to gather and disseminate news and information concerning every phase of human activity, together with the incidents appertaining thereto. This right makes the press the most potent servant of the people in protecting all rights against acts of tyranny, fraud, and corruption, as well as a most prolific medium of information and education. Freedom of the press is the fulcrum by which the standards of the world have been lifted to a higher level. Hence, we can understand why it has been many times held that these provisions of free press extend to broadcasting and television. Courts of the United States make no distinction between various methods of communication in sustaining freedom of the press. Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; Public Utilities Comm. v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068; Wrather-Alvarez Broadcasting Co. v. Hewicker, 147 Cal.App.2d 509, 305 P.2d 236; Superior Films, Inc., v. Department of Education, 346 U.S. 587, 74 S.Ct. 286, 98 L.Ed. 329. We are of the opinion freedom of speech and press is not a discriminate right, but the equal right of news gathering and disseminating agencies, subject only to the restrictions against abuse and injurious use to individual or public rights and welfare. We are further of the opinion that to deny television the same privileges as are granted to the press would constitute unwarranted discrimination.

Another fundamental right of primary importance herein is set forth in Article II, Section 20 of the Oklahoma Constitution, to-wit:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury * * *."

The Sixth Amendment to the United States Constitution contains the same language. In Neal v. State, 86 Okl.Cr. 283, 192 P.2d 294, 295, it was said:

"The provision is one of the important safeguards that were soon deemed necessary to round out the Constitution, and it was due to the historical warnings of the evil practice of the Star Chamber in England. The corrective influence of public attendance at trials for crime was considered important to the liberty of the people, and it is only by steadily supporting the safeguard that it is kept from being undermined and finally destroyed. As the expression necessarily implies, a public trial is a trial at which the public is free to attend. It is not essential to the right of attendance that a person be a relative of the accused, an attorney, a witness, or a reporter for the press, nor can those classes be taken as the exclusive representatives of the public. Men may have no interest whatever in the trial, except to see how justice is done in the courts of their country."

This Court has held that the constitutional provisions guaranteeing to every person in the trial of a criminal case certain rights may be separated into two classes. First, those in which the public generally and as a community is interested, as well as the accused, and which are jurisdictional as affecting the power of the court to try the cause; second, those more in the nature of privileges which are for the benefit of the accused alone, and do not affect the general public. The former cannot be waived, but the accused may waive a constitutional right or privilege designed for his protection where no question of public policy is involved. Ex parte Merton, 89 Okl.Cr. 76, 205 P.2d 340. That the courts of Oklahoma be open to every person is a matter of public policy. In Neal v. State, supra, in the body of the opinion, we said:

"It not alone affects the accused but the public also is interested in knowing how their servants, the judge, county attorney, sheriff, and court clerk conduct public business."

As said in the Neal case and others, including People v. Jelke, 308 N.Y. 56, 123 N.E.2d 769, 48 A.L.R.2d 1425, and United States v. Kobli, 3 Cir., 172 F.2d 919, the courts in certain unusual circumstances may restrict the attendance of the public for various sound reasons, which, under proper circumstances, might include some pressmen and television cameramen, but they cannot under the constitution exclude the public generally or entirely. The doors of our courts must never be closed for Star Chamber sessions. They must be open to the press and its prying eyes and purifying pen to report courtroom abuses, evil and corrupt influences which despoil and stagnate the flow of equal and exact justice. In fact, it has been held the right of a public trial is abridged if the press is excluded. In re Hearings Concerning Canon 35, supra; Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546; State of Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562. In re Hearings Concerning Canon 35, supra [296 P.2d 467], quotes from Craig v. Harney, supra, this pertinent language:

" 'A trial is a public event. What transpires in the court room is public property. * * * Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it.' It is equally well established that freedom of the press is not confined to newspapers or periodicals, but is a right of wide import and ' * * * in its historic connotation comprehends. every sort of publication which affords a vehicle of information and opinion.' Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 669, 82 L.Ed. 949; Burstyn, Inc., v. Wilson, supra, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098.

"Tempering the effect of the foregoing is the oft repeated truism that 'No freedoms are absolute.' The freedoms of speech and press are not exceptions. No one denies the existence of broad powers inherent in the ju-

diciary. This power unquestionably includes the right of the courts to determine the manner in which they shall operate in order to administer justice with dignity and decorum, and in such manner as shall be conducive to fair and impartial trials and the ascertainment of truth uninfluenced by extraneous matters or distractions. If at any time the representatives of the 'press' in any field of activity interfere with the orderly conduct of court procedure, or create distractions interfering therewith, the court has the inherent power to put an immediate stop to such conduct. No claim of justification on the ground of freedom of the press would be available to those guilty of such offensive conduct."

But, where court proceedings may be taken for reproduction on sound track and film without disruption or in a manner not degrading to the court, and without infringement upon any fundamental right of the accused, why should not such agencies, within reasonable rules prescribed by the courts, be permitted so to do? It appears there is "a conflict between liberty and authority, a conflict that is sometimes labelled 'civil rights v. the police power' or 'liberty of the individual v. the general welfare.'" Hamilton v. City of Montrose, 109 Colo. 228, 124 P.2d 757, 759. These conflicts must be resolved so as not to do violence to the civil liberties of the individual, the rights of the public, and so as not to detract from the essential dignity of the proceedings and degrade the court. The matter must be resolved in every case in terms of the foregoing principles with due regard to the rights of both the individual and the public. The resolution should be made on the basis of realities and not with conjecture. Basically, there is no sound reason why photographers and television representatives should not be entitled to the same privileges of the courtroom as other members of the press. Certainly there is much force in the Chinese proverb, one picture is worth a thousand words.

The two principal reasons urged by those opposed to opening court proceedings to photographic representatives of the press and television are first, the alleged invasion of the defendant's right of privacy, and second, that to permit picture taking and sound recording in the courtroom during judicial proceedings or any recess thereof will introduce extraneous influences into the proceedings which will produce bad psychological results, and divert the proper objective of the trial.

On this first contention as to the invasion of the right of privacy, the Colorado Supreme Court in In re Hearings Concerning Canon 35, supra, 296 P.2d at page 470 answered this point as follows:

"First: One needs only to cite the law applicable to the question, which unequivocally and repeatedly has stated that when one becomes identified with an occurrence of public or general interest, he emerges from his seclusion and it is not an invasion of his 'right of privacy' to publish his photograph or to otherwise give publicity to his connection with that event. The law does not recognize a right of privacy in connection with that which is inherently a public matter. Numerous cases are available on the subject and I have found no disagreement as to the law. Berg v. Minneapolis Star & Tribune Co., D.C., 79 F.Supp. 957; Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491; Jacova v. Southern Radio & Television Co., Fla., 83 So.2d 34; Jones v. Herald Post Co., 230 Ky. 227, 18 S.W.2d 972; Humiston v. Universal Film Mfg. Co., 189 App.Div. 467, 178 N.Y.S. 752; Smith v. Doss, 1948, 251 Ala. 250, 37 So.2d 118; Elmhurst v. Pearson, 80 U.S.App.D.C. 372, 153 F.2d 467; Gautier v. Pro-Football, Inc., 1952, 304 N.Y. 354, 107 N.E.2d 485; Ettore v. Philco Television Broadcasting Corp., D.C.Pa.1954, 126 F.Supp. 143.

"Second: To uphold Canon 35 on the ground that it prevents a violation

of the individual's 'right of privacy' would be to repudiate the provision of our constitution by rule of court, and to make effective the prior restraint upon freedom to publish, although the constitution expressly prohibits such restraints by clearly indicating that the remedy for abuse of the constitutional right to publish 'whatever he will on any subject' is that the publisher shall be 'responsible for all abuse of that liberty.' How can it be contended that the prior restraint upon conduct imposed by the canon is valid when the constitution clearly indicates that the remedy for abuse of the 'right of privacy' must be compensatory in its character?"

The foregoing applies with equal force in Oklahoma since there is no substantial difference in the language of the Colorado Constitution and the Oklahoma Constitution as to freedom of speech and press and the abuse thereof. We are likewise of the opinion that when one becomes involved in law violation he abandons his right of privacy at the risk of apprehension and when identified with crime, he becomes a public figure in which the public has more than an ordinary interest. We are further of the opinion that in this case since the trial was open to the public simply extending the privilege of seeing some of the proceedings to televiewers was merely in support of that principle.

■ The second objection advanced by oppositionist is relative to interference with the court proceedings, introduction of extraneous influences, and degradation of the court. Canon 35 presumes the taking of pictures in the courtroom for broadcasting will in every case precipitate disturbance and distraction. This is an unwarranted presumption where the trial court by prearrangement is the master of the forum. Of course, no court should tolerate conditions of either distraction or disturbance to the proceedings. This Court is not without experience on this issue. On numerous occasions, supervised televising in this Court has been conducted.

Our experience is that when properly supervised by the court, there is neither disturbance, distraction, nor lack of dignity or decorum. In this connection, we are buttressed by the Colorado Supreme Court after its extensive inquiry into modern televising methods. In re Hearings Concerning Canon 35, supra. Certainly in the case at bar, though photographs were taken in the courtroom, during recess, the defendant was unable to produce any evidence of either distraction or disturbance. Neither was he able to produce a single fact to support that either he or the court were affected in their rights in a substantial way. This contention presents itself as a baseless boogey constructed out of pure conjecture. We are of the opinion that the presumption upon which Canon 35 has been constructed is fabricated out of sheer implication and not hammered out on the anvil of experience. Of course, in every case to avoid dislocation of the trial or proceeding, the setting should be prearranged so that the trial court may, upon proper objection, by merely pressing a button suspend the making of photographs and sound recording, otherwise, the right should be withheld. The arrangement should be so that the court is in command at all times; it should never be in a position of subserviency.

An argument which appeals to us in support of extending the privileges of freedom of the press to televisors of court proceedings is the necessity of educating and informing our people concerning the proper functioning of the courts. It has been said without education the people perish. There is no field of government about which the people know so little as they do about the courts. There is no field of government about which they should know as much, as about their courts. Those institutions of justice engaged in construing constitutional rights and interpreting legislative acts which will determine our enjoyment of life and liberty and our pursuit of happiness. What is more vital to the people? Many members of the legal profession who advocate the dissemination of knowledge for every purpose in all other

fields rebel at the thought of the people being informed concerning the operations of the lawyers' legal preserve. The courts do not belong to the lawyers but are institutions by, of, and for the people. In this modern age, it is well that the veil of mysticism surrounding our courts be removed and the people be confronted with reality. We are not afraid or ashamed and we must be consistent. On this point we feel as Justice Moore:

"It is highly inconsistent to complain of the ignorance and apathy of voters and then to 'close the windows of information through which they might observe and learn.' Generally only idle people, pursuing 'idle curiosity' have time to visit court rooms in person. What harm could result from portraying by photo, film, radio and screen to the business, professional and rural leadership of a community, as well as to the average citizen regularly employed, the true picture of the administration of justice? Has anyone been heard to complain that the employment of photographs, radio and television upon the solemn occasion of the last Presidential Inauguration or the Coronation of Elizabeth II was to satisfy an 'idle curiosity'? Do we hear complaints that the employment of these modern devices of thought transmission in the pulpits of our great churches destroys the dignity of the service; that they degrade the pulpit or create misconceptions in the mind of the public? The answers are obvious. That which is carried out with dignity will not become undignified because more people may be permitted to see and hear."

It is even suggested a theatrical atmosphere will be created and

"that some trial judges, and lawyers 'who are hungry for publicity, will conclude that they are actors, and by some psychological motivation "play to the galleries" and so conduct themselves as to satisfy their own vanity, or otherwise exploit themselves.'

"Any judge or lawyer who so demeans himself before a camera does not change his inherent characteristics for that particular occasion. A 'show-off' or a 'strutter' will be just that whether a camera is present or not. They are readily identified by any person of ordinary intelligence and are ultimately adequately and justly disposed of by the people. If a larger segment of society is permitted to witness such offensive conduct the offender will be properly judged by the people sooner than might otherwise be possible. * * * It is perfectly obvious that the solution of the problem does not lie in arbitrarily forbidding the photographing or broadcasting of court proceedings. A constitutional right of all citizens cannot be denied because a very few persons may conceivably make fools of themselves before a larger audience than that which might otherwise be subjected to their offensive conduct. In the case of State v. Hensley, 75 Ohio St. 255, 79 N.E. 462, 463, 9 L.R.A.,N.S., 277, the court said:

" 'The people have the right to know what is being done in their courts, and free observation and the utmost freedom of discussion of the proceedings of public tribunals that is consistent with truth and decency tends to the public welfare.' "

In re Hearings Concerning Canon 35, supra. All too long the public concept of court room proceedings and demeanor has been the antiquated or distorted motion picture portrayals. It is time the people were shown the truth about their courts. How can the people have respect for that branch of government concerning which they grope in ignorance and the only knowledge they possess about it is based upon distortions and misrepresentation?

It has been argued that to open the courts to photographers and televisors would confront the trial judge with swarms of highly competitive persons seeking to photograph and broadcast court proceedings. If such were to become a reality,

it would be difficult to maintain order and decorum. The press and broadcasting interests of Oklahoma are alert to this situation and·have proposed the organization of a permanent association for pooling their facilities for effectively meeting this objection. The nucleus of such an association is now in being in Oklahoma. It should be perfected and open to all agencies desiring to cooperate. We are informed that a committee will be named whose duty will be to fix responsibility for courtroom telecasts, where permitted. They propose to follow the procedure outlined by the broadcasters in the Colorado Supreme Court opinion hereinbefore referred to.

" 'Whenever any of the member stations wish to cover a given trial, they will communicate with the secretary who will carry the request to the judge. Should the judge decree that radio and television coverage will be permitted, he need deal with only one individual—that is the secretary—in laying down the ground rules ʿfor such coverage. Having reached a clear understanding where the microphones and cameras shall be placed in the courtroom, the secretary shall then make the necessary arrangements for equipment and personnel. In all cases the Association pledges that it shall be a minimum amount of equipment. It is understood that the judge must be fully satisfied with the installation before the trial begins.' "

We suggest such installation should be so situated as not to interfere with or distract the participants or disturb the decorum of the trial court, as hereinbefore indicated. The arrangements should be made by and with the consent and permission of the trial court in every case, under such conditions as he may deem necessary to preserve the dignity of the court and not interfere with the administration of justice. For live telecasts, the cameras should be concealed in a booth in the rear of the courtroom, or from an installation outside the courtroom with only the lens appearing from an exterior wall.

The microphones should be installed so as not to distract the participants. When the tape and films have been made of the proceedings, duplicate tape recordings and film prints should be made available to all the radio and television stations that desire them. In this way, as many stations as wish may derive the benefits from the pool, yet there will be only one set of equipment for radio and one set for television. This pooling of facilities is for the mutual benefit of the broadcasting fraternity and the court to insure that· reporters and cameramen may not swarm on the court like a scourge of locusts. Press photographers should establish similar facilities of cooperation.

 We believe that the restatement of Canon 35 as promulgated by the Colorado Supreme Court in In re Hearings Concerning Canon 35, supra, in so far as the televising and photographing of criminal trials and proceedings are concerned is adequate to overcome the objection thereto and sufficient, where followed, to protect the rights of both the individual and the public. That rule reads as follows:

"Until further order of this Court, if the trial judge" in a criminal action "in any court shall believe from. the particular circumstances of a given case, or any portion thereof, that the taking of photographs in the court room, or the broadcasting by radio or television of court proceedings would detract from the dignity thereof, distract the witness in giving his testimony, degrade the court, or otherwise materially interfere with the achievement of a fair trial, it should not be permitted; provided, however, that no witness or juror in attendance under subpoena or order of the court shall be photographed or have his testimony broadcast over his expressed objection; and provided further that under no circumstances shall any court proceeding be photographed or broadcast by any person without first having obtained permission from the trial judge to

do so, and then only under such regulations as shall be prescribed by him."

As has been said:

"The broad discretion thus given the trial court affords ample protection against abuses of the constitutional right of freedom of the press, and will lead to a cooperative effort as between the judiciary and the press to protect, preserve, and portray, the judicial process upon that level of justice to which it actually attains."

In re Hearings Concerning Canon 35, supra. We are of the opinion the matter of televising or not televising, photographing or not photographing criminal trials and proceedings, subject to the hereinbefore suggested standards, is within the sound discretion of the trial judge. In no other way can the constitutional rights of all, the individual, the broadcaster, the press, and the public be reconciled. When abuses of discretion occur, we will meet them on appeal and not in a manner of preconception and on a basis of unrealistic presumption. Herein, the trial court neither committed error nor abused its discretion in the foregoing regard as the defendant contends.

■ Next, the defendant contends that the state committed reversible error in part of its opening statement by misreading a former conviction as to the actual offense of which the defendant was convicted, and after so doing, informed the jury the defendant had entered a plea of guilty to the instant charge when in fact he had entered a plea of not guilty. It is a fact that the information was carelessly drawn and when first read contained an allegation of a second prior conviction which was subsequently stricken. This procedure was favorable to the defendant, since it diminished the burden of his defense. On the second reading to the jury, the county attorney discovered another careless insertion, the charging of a higher degree of another prior conviction of a felony, and amendment was permitted to change the allegation to a lesser degree of

felony. This did not change the substance of the charge since all the law requires is that a prior felony conviction be alleged as the basis of a second and subsequent offense charge. Moreover, the amended form, being of a lesser degree of offense, could not be prejudicial. The record discloses the defendant made no objection to this amendment but only to the rereading of the information in its amended form. While such carelessness in the drafting and filing of informations is to be deplored, under the facts herewith presented, it could not be prejudicial. It was preferable to amend the information in the foregoing manner before the trial and reread the information as finally amended to the jury, than wait until the proof was all in and then move to amend to conform to the proof. It was less confusing that the jury be clearly informed of the amended charge before proof was offered. To do this, it had to be reread. Such comedies of error, though not always reversible, should be avoided.

■ On the question of the county attorney informing the jury the defendant entered a plea of guilty, the record discloses the county attorney in the sentence immediately preceding, had informed the jury the defendant entered a plea of not guilty to the information, and that in the line immediately following, committed a slip of the tongue and referred to the plea as one of guilty. When the matter was called to his attention, he immediately reiterated that the plea was one of not guilty. The jury being correctly informed as to the plea in the first instance and the correction having been immediately made as to the inadvertent error, this forms no basis for substantial complaint. The county attorney confessed to the jury that his embarrassment and confusion was prompted by the matter that preceded.

■ The defendant's third contention is that the trial court erred in not sustaining his motion to suppress and in admitting evidence obtained in an unlawful arrest. We have searched the record and

have found no motion to suppress. There is only some slight reference thereto by defense counsel and the court, but nowhere does a formal motion to suppress appear. Moreover, there is no objection to introduction of evidence at the commencement of trial. It is thus apparent that the defendant, by going to trial without making timely objection to the evidence and moving to suppress the same, waived objection thereto. Fields v. State, 31 Okl.Cr. 121, 236 P. 633. The defendant offered no evidence in support of his motion to suppress, even if one were filed. The burden was on the defendant to establish his motion which he did not sustain. Sears v. State, 79 Okl.Cr. 437, 156 P.2d 145.

Be that as it may, the evidence seized in the search was not necessary to establish the charge of burglary. Breaking and entering and taking candy, cigarettes, etc., from the Barton North West Drive-In Theatre was definitely established by the testimony of Mr. R. Lewis Barton, to which no objection was interposed, not even to identifying a pop corn sack and candy box with his name thereon found in the defendant's possession. The defendant's failure to object to the identification and introduction into evidence of these articles constituted a waiver of the right of assert their invalidity. Sears v. State, supra. This testimony clearly established the corpus delicti. The record shows the defendant confessed his part in the crime to officers Casady and Cooper, which was sufficient to identify the defendant with the crime alleged and proved. Among the things in the confession was that a lone glove found at the scene of the crime belonged to the defendant. This undisputed evidence further established the defendant's participation in the crime. Morrison v. State, 88 Neb. 682, 130 N.W. 293. The defendant offered no testimony contrary to all the foregoing. The defendant attempted to raise the invalidity of the search and seizure, and denial of the purported motion to suppress the evidence by motion for directed verdict, but this came too late. Ashby v. State, 33 Okl.Cr. 297, 243 P. 1003. In view of the record thus made, the defendant's contention in this regard is without merit and the authorities cited in support of this contention are not in point.

Finally, the defendant contends the trial court erred in not instructing the jury on second degree burglary. The defendant made no objection to the instructions given and requested no other instructions in addition to those given. We have examined the instructions and find them to be fair and a substantial statement of the law and not prejudicial to the defendant's rights. If the defendant desired other or different instructions, he should have requested them. Green v. State, 70 Okl.Cr. 228, 105 P.2d 795; Hicks v. State, 93 Okl.Cr. 311, 227 P.2d 685; Pumpkin v. State, Okl.Cr., 295 P.2d 819. Under these conditions, this contention cannot now be successfully asserted as error, since he waived objection thereto.

In light of the foregoing, we are of the opinion that this conviction should be and the same is accordingly affirmed.

POWELL and NIX, JJ., concur.

POWELL, Judge (concurring).

I concur in Judge Brett's opinion rendered herein on September 3, 1958. It covers the subject thoroughly in a field where, with the exception of Judge Moore's exhaustive study (In re Hearings Concerning Canon 35 of the Canons of Judicial Ethics, Colo., 296 P.2d 465) there are no express decisions of the courts on the subject. General principles evolved from the consideration of constitutional and statutory provisions as applied to the field of communications, heretofore generally limited to the press, have been of aid.

There can be no doubt that the purpose of Canon 35 is laudable. The Hauptman trial involving the kidnapping of the Lindbergh infant turned into a prolonged circus. At least it may safely be said that the general public eventually arrived at such conclusion, and such is not a healthful situation. We want no more of that.

Undoubtedly there must be decorum; no condition must be permitted that would detract from the dignity of the proceedings, or distract the attention of those engaged in the proceedings. Concededly, court proceedings must be conducted in such manner as to be conducive to the ascertainment of truth uninfluenced by extraneous matters. The trial must be fair and impartial if democratic principles are to survive.

But, overall, the effort must be made to accomplish all this while at the same time affording the general public, who after all in a democracy have the last say (for all governmental power is derived from the people), opportunity to know and see how an accused is afforded due process of law. That way he will come to have a greater respect for the principles of democracy.

There was a time when mechanical and technical development had not reached that point where the requirements to meet the principles stated could be met. But a careful reading of Judge Moore's report in the Colorado case, and the current opinion from this court, is revealing and dispels the forced maxim of Canon 35 that "the taking of photographs in the court room during sessions of the court or recesses between sessions, and the broadcasting of court proceedings are *calculated* to detract from the essential dignity of the proceedings." (Emphasis supplied.) The rule makes such per se intolerable and forbidden without further consideration of the conditions in a particular case where the modern equipment may be such that the participants, except the judge and his bailiff and reporter, may be unaware of the fact that pictures are being made, or the conversations, questions and answers, recorded.

With the elimination of the objectionable features of various photographers and communication technicians, swarming in a court room with bulky equipment and competing, then the only thing left is the question of the rights of the public at large to see just how a trial is conducted, where

the court rooms of necessity are limited as to capacity for spectators, and the employment of the citizen such as to prevent him from seeing and hearing what he would like to in order that he might more properly keep abreast of the workings of one of the three branches of his government. This would constitute an educational opportunity for the citizen and enable him more truly to gain an insight into the working of the courts, not so realistically revealed by the written word.

Too, it must be recognized that many, many of our citizens come home at night from their work tired, many are not good readers, do not comprehend the technical language of the reporter, but they can see, and as reminded in the opinion, "one picture is worth a thousand words", according to the Chinese proverb.

As I view the matter, the public has a deep interest in the trial of criminal cases as distinguished from the participants. Except in civil cases, and particularly divorce cases, the parties should not be allowed to waive public hearings, because the community at large is vitally interested in the right to observe the administration of justice, that the presence of the public and the press as well as the modern cameraman, as limited by the opinion, is as basic as the defendant's right to a public trial, whether such right be specifically provided in the constitution or not. And while an accused may waive his right to a public trial, I do not think that he may waive the right to the public to insist upon a public trial.[1]

The Kefauver Committee, investigating organized crime in the United States, permitted the proceedings to be televised, and forcefully brought to the attention of the people the seriousness and gravity of their problem. The public was abled to judge the apparent qualifications of its public servants for the jobs they were attempting to perform, see the tactics of counsel representing powerful underworld characters, politicians of a local level, and above all,

1. See E. W. Scripps Co. v. Fulton, 100 Ohio App. 157, 125 N.E.2d 896; United Press Associations v. Valente, 308 N.Y. 71, 123 N.E.2d 777.

observe the mannerisms, the facial expressions and countenances of the persons under investigation, or simply acting as witnesses.

Television affords the public opportunity without comment of a reporter, to judge whether a witness is attempting to be facetious or evasive, and where a dodge behind the Fifth Amendment is involved, whether the course is followed by a smirk of triumph or of honest distress, or whatever the reason may be, where discernable.

The McClelland Committee, now current, demonstrates the high plane reached by visual reporting, and is alerting the public to the perils that beset the citizenry, in a way that not long ago was not even dreamed possible.

We have in this court had experience with the television people, and such has been favorable. Where cases of notoriety have become beclouded by the conflicting reports of various newspapermen, the visual broadcasting of actual proceedings has demonstrated the due process of law and in a light healthful and favorable.

I have nothing further to say on the other points treated in the opinion.