Tony GARRETT

v.

W. J. ESTELLE, Jr., Individually and in his capacity as Chief Director of Texas Department of Corrections, et al.

Civ. A. No. 3–76–1601–C.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 13, 1977.

Fred E. Time, Tom S. McCorkle, Jr., Peter A. Lesser, Dallas, Tex., for plaintiff.

David M. Kendall, Jr., First Asst. Atty. Gen., Joe B. Dibrell, Jr., Asst. Atty. Gen., Austin, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

Plaintiff Tony Garrett, a television reporter for Public Broadcasting System's station KERA, Channel 13, of Dallas, Texas, is before this Court asserting a First and Fourteenth Amendment right to record on film, for possible later showing on television news, the execution of the first person to be executed since 1964 in the electric chair at the Texas Department of Corrections facility in Huntsville, Texas. At the time of filing his petition herein on December 13, 1976, the execution of a condemned prisoner was scheduled to take place on December 27, 1976. Other executions were scheduled for January 14, 1977, and thereafter.[1] Plaintiff Garrett also seeks access to the inmates now confined by the State of Texas on "death row" in the penitentiary at Huntsville, Texas, for the purpose of filming interviews with designated condemned prisoners.

On November 29, 1976, plaintiff had requested permission of the appropriate state official—Mr. Ronald Taylor, Assistant Director of the Texas Department of Corrections—to film the first execution in Texas since 1964 and also permission to film interviews with condemned prisoners then confined on "death row" at the Texas Department of Corrections. Both requests were

denied. In refusing these requests the officials at the Texas Department of Corrections pointed to Article 43.17 and Article 43.20 of the Texas Code of Criminal Procedure. Article 43.17 reads as follows:

> Upon the receipt of such condemned person by the Director of the Department of Corrections, he shall be confined therein until the time for his execution arrives, and while so confined, all persons outside of said prison shall be denied access to him, except his physician and lawyer, who shall be admitted to see him when necessary to his health or for the transaction of business, and the relatives, friends and spiritual advisors of the condemned person, who shall be admitted to see and converse with him at all proper times, under such reasonable rules and regulations as may be made by the Board of Directors of the Department of Corrections.

Article 43.20 provides as follows:

> The following persons may be present at the execution: the executioner, and such persons as may be necessary to assist him in conducting the execution; the Board of Directors of the Department of Corrections, two physicians, including the prison physician, the spiritual advisor of the condemned, the chaplains of the Department of Corrections, the county judge and sheriff of the county in which the Department of Corrections is situated, and any of the relatives or friends of the condemned person that he may request, not exceeding five in number, shall be admitted. No convict shall be permitted by the prison authorities to witness the execution.

During the years preceding plaintiff's requests, the Texas Department of Corrections had followed an "open-door" policy with the news media and had finally reduced its media policy in regard to prisoners on "death row" to a written policy statement which reads as follows:

---

1. Prior to the hearing of all of the evidence and arguments of counsel in this case, the December 27, 1976, and January 14, 1977, electrocutions were stayed by the Supreme Court of the United States.

*Media Policy: Execution Proceedings*

One Texas bureau representative designated by the Associated Press and one Texas bureau representative designated by the United Press International will be admitted to the execution chamber as witnesses, provided those designated agree to act as pool reporters for the remainder of the media present and to meet with all media representatives present immediately subsequent to the execution. The remainder of the media shall be allowed to witness the execution via closed circuit television monitors.

Press interviews of condemned prisoners shall be scheduled by the Public Affairs Office and conducted at the Ellis Unit each Wednesday during the hours of 9:00—11:00 A.M.

No press interviews of the condemned shall be allowed at the Huntsville Unit. Only properly credentialed press will be admitted to witness the execution.

No recording devices, either audio or video, shall be permitted either in the execution chamber or monitor room. All persons entering the monitor area shall submit to electronic surveillance. Any person detected attempting to introduce recording equipment into the monitor area shall be excluded automatically.

No video tapes shall be made from the monitor system.

TDC shall provide the press the following data:

. . . Historical data concerning the death penalty

. . . Public record information concerning the condemned (Name, D.O.B., Race, County of Conviction, Date Received)

. . . Photograph of condemned.

This media policy had come about as a result of the public interest in capital punishment which had increased in intensity following the decision of the Supreme Court on July 2, 1976, in the case of *Jerry Lane Jurek v. State of Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. In 1972 the Supreme Court had struck down as unconstitutional the Texas death penalty statute in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, and the statute was amended by the Texas legislature. It was this amended statute that the Supreme Court held to be constitutional on July 2, 1976, in *Jurek v. Texas, supra.* There have been no executions in Texas since 1964, and the first execution to take place since that year was felt by many to be an historical and newsworthy event. It was in the light of this controversy which was raging not only in Texas but throughout the Nation concerning the propriety of the death penalty that plaintiff sought permission to film interviews with prisoners on "death row" and to film the first execution for possible later showing on television.

Since 1924 when Texas determined that the electric chair should be the instrument of capital punishment, representatives of the print media have had access to executions and to condemned prisoners on "death row." Upon being advised of the above-quoted articles of the Texas Code of Criminal Procedure, however, Mr. W. J. Estelle, Jr., Director of the Texas Department of Corrections, concluded that representatives of the news media, both print and electronic, should be excluded not only from executions but also from any access whatsoever to prisoners on "death row."

On the question of denying the news media access to "death row" for the purpose of interviewing condemned prisoners, the defendants rely exclusively on the cases of *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495, and *Saxbe v. Washington Post Company,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514. While the Supreme Court of the United States did in the *Pell* case uphold the California statute which denied press and other media interviews with specific individual inmates and in *Saxbe* upheld the Policy Statement of the Federal Bureau of Prisons prohibiting personal interviews between newsmen and individually designated inmates of federal medium security and maximum security prisons, there is little, if any, similarity between those cases and the one at bar.

In *Pell* and *Saxbe* the object of the news media was to report the day-to-day operation of the prisons. Here, the news media is seeking to report on one of the most important and controversial public issues of the day: capital punishment. The carrying out of the death penalty is an act of state. It is the ultimate act of state. A state execution is an act of the collective wills of all the people. For 13 years no person in Texas has been subjected to the death penalty and such a significant change in state policy should be accompanied in a democratic society by the widest possible public knowledge and information. The persons who under Article 43.17 and Article 43.20 of the Texas Code of Criminal Procedure are given access to condemned persons and permitted to be present at the execution can in no sense of the word be considered as representative of the public. Only representatives of the news media can be considered to be representatives of the public and because of the size of the execution chamber only a limited number of newsmen can be admitted. The people through these representatives must have access to the dungeons and the "death rows" so that the people remain aware of the workings of their government. If there is any subject about which the people have a "right to know," surely it is this. " . . . the First Amendment is one of the vital bulwarks of our national commitment to intelligent self-government." See dissenting opinion of Justice Powell in *Saxbe, supra* at p. 862, 94 S.Ct. at p. 2821.

A second important difference between this case and the *Pell* and *Saxbe* cases is that there was substantial news media access to the correctional institutions involved in those cases. Here, under the above-quoted statutes, there is no public access whatsoever to "death row" and no public witnessing of an execution. Specifically, in *Pell* and *Saxbe* there were regular press tours of the prisons during which news media representatives could photograph inmates and facilities and interview those prisoners they encountered. Also in *Pell* and *Saxbe,* the news media had access to recently released inmates for information.

This circumstance will not exist insofar as inmates on "death row" are concerned. In short, the only access the public or the news media have to "death row" in Texas is that which can be gained indirectly from attorneys and family members who have visited inmates and through letters received from inmates, many of whom are at best marginally literate.

The third major difference between this case and the *Pell* and *Saxbe* cases is that there were in those cases some justifications for restrictions on interviews, none of which are present here. In those cases there was evidence that interview restrictions were necessary for prison security. Here, TDC officials state that their news media policies permitting interviews never compromised prison security in any way. Further, in those cases there was evidence that the interviews had created disciplinary problems. In this case the extent of disciplinary problems was that some inmates had "heaped verbal abuse" upon a fellow inmate who had given an interview. Also in *Pell* and *Saxbe* there was evidence that the presence of news media representatives adversely affected rehabilitation. In this case, of course, "death row" inmates are not there for rehabilitation. In fact, under the Texas statute a specific jury finding is required to the effect that it is probable that the defendant would commit criminal acts of violence constituting a continuing threat to society before the death penalty can be assessed. Finally, TDC officials testified that the policy of permitting interviews from 9:00 to 11:00 A.M. on Wednesdays had not even caused any appreciable administrative inconvenience.

Fourth, in *Pell* and *Saxbe,* the Court was concerned that the granting of press interviews might diminish the deterrent value of imprisonment. While this may be a proper consideration with respect to normal prison inmates, it can scarcely be applicable to condemned inmates awaiting the most extreme punishment that society can administer.

██ The foregoing considerations and the admonition in *Branzburg v. Hayes,* 408

U.S. 665 at 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626, that "without some protection for seeking out the news, freedom of the press could be eviscerated" compels the holding that the absolute ban on news media access to the prisoners on "death row" and to the execution chamber by Article 43.17 and Article 43.20, Texas Code of Criminal Procedure infringes on the First Amendment freedom of press.

That there can be no complete ban on access to "death row" or to executions, of course, does not mean that there can be no regulation of public or media access to "death row" and the inmates therein. On the contrary, prison officials have broad authority to regulate and limit access where there are security, disciplinary, rehabilitation, administrative, or other reasons for so doing. All this Court is ordering is that the Texas Department of Corrections restore the limited access it previously allowed and, in addition, to permit one television reporter with camera to witness any execution.

To go further and articulate the obvious, the state may clearly regulate access to prisons in terms of numbers of visitors to be admitted, times they are permitted to remain, advance notice required to be given, and in many other respects. In fact, there are any number of reasonable regulations that could properly be imposed in the interest of prison security, discipline, and good order. All that we are saying here is that, particularly where the First Amendment freedom of the press is involved, the state cannot be permitted, where there is no reason or justification for so doing, to draw an impenetrable veil of secrecy around a public institution being operated by public officials, with public moneys, for the welfare of the public. To permit such a ban on access to a public institution, where there is no need or justification for it, would be to permit arbitrary, capricious and unreasonable restraints to be placed upon the right of the people to know what their own government is doing. It is inconceivable that this could be permitted in a democratic society.

With our technological advances, the electronic media, both television and radio, have become an integral part of the national communication system by which our people obtain the information upon which to form their judgments about national policies. One final point to be considered, therefore, is whether any of the distinctions which have been made in the past between print and electronic news media are applicable in the coverage of an execution. We are unable to find that they are.

The most important distinction between print and electronic access to public events involves coverage of trials. As the Supreme Court of the United States pointed out in *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, however, cameras are excluded from trials because they tend to disrupt the proceedings. Specifically, the Court in the *Estes* case said that the presence of cameras in a courtroom tends to distract jurors, influence witnesses so as to distort their testimony, harass and prejudice the defendant, and make it more difficult for the judge to guarantee a fair trial. Similarly, cameras are often excluded from other *deliberative* proceedings.

An execution, however, is an entirely mechanical process carried out only after all deliberative proceedings have been completed. It is not seriously contended that a single television reporter, carrying a compact, quiet, portable film camera requiring no special lighting, can in any way disrupt or interfere with this state proceeding.

Of course, the real concern is not over the presence of a television reporter with camera at an execution or even the filming of the execution, but rather the possible later broadcast of such film on television news programs. It is argued that such broadcasts would be an "offense to human dignity," "distasteful," or "shocking." This may well be true, but the question here is whether such decisions are to be made by government officials or by television news directors. The state says, in effect, that "We, the government, have determined that the governmental activity in this instance is not fit to be seen by the people on

television news." In addition to being ironic, such a position is dangerous.[2] If government officials can prevent the public from witnessing films of governmental proceedings solely because the government subjectively decides that it is not fit for public viewing, then news cameras might be barred from other public facilities where public officials are involved in illegal, immoral, or other improper activities that might be "offensive," "shocking," "distasteful" or otherwise disturbing to viewers of television news.

 The government cannot be allowed to bar cameras from governmental proceedings without more compelling and factually demonstrable reasons than such vague and highly subjective concepts as "taste" and "dignity." Unless there is some substantial factual basis for denying access to public proceedings, it is for the news media itself to determine what governmental activities are sufficiently tasteful, dignified, or acceptable to be reported. As the Supreme Court has observed, "That editors—newspaper and broadcast—can and do abuse . . . [the power to select and choose news material] is beyond doubt, but that is no reason to deny this discretion . . . .. Calculated risks of abuse are taken in order to preserve higher values. The presence of these risks is nothing new; the authors of the Bill of Rights accepted the reality that these risks were evils for which there was no acceptable remedy other than a spirit of moderation and a sense of responsibility—and civility—on the part of those who exercise the guaranteed freedoms of expression." *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 124–125, 93 S.Ct. 2080, 36 L.Ed.2d 772.

In addition, the people themselves are the final masters of what news they consume; they have the most effective tools with which to shield themselves from reports they consider unacceptable—selective reading and selective television viewing. With

such effective self defense mechanisms, it is difficult to understand why any government official in an open, republican society would presume to arrogate to himself the function of news censor, even if there were no First Amendment. As James Madison stated, "If we advert to the nature of republican government, we shall find that the censorial power is in the people over the government, and not in the government over the people." 4 Annals of Congress 934 (1794).

For the foregoing reasons, this Court, on January 5, 1977, issued a preliminary injunction declaring Article 43.17 of the Texas Code of Criminal Procedure violative of the First Amendment as an absolute and unjustified ban on access of the news media to "death row" inmates; ordering the re-institution of the TDC media policy permitting interviews with "death row" inmates between the hours of 9:00–11:00 A.M. on Wednesdays; ordering the re-institution of the TDC policy to permit two pool representatives of the print media to witness any execution; and ordering the admission of plaintiff Tony Garrett to any execution for purposes of filming such execution, provided that plaintiff agrees to act as pool representative for the electronic media and to provide, at cost, copies of film so taken to other representatives of the news media. An amended Injunction, incorporating minor technical modifications, was entered on January 11, 1977.

---

**2.** It might be suggested here that if what the government is doing is so terrible, perhaps the government should not be doing it. At the very least, the people should have the widest possible information about such "shocking" governmental proceedings.