Ronald Earl STAHL, William A. Collard, and Michael D. Kelly, Vicki Jean Monks, Ben Bernstein, Mark Raymond Emerson, David P. McDaniel, Eli W. Nixon and Steve Wolfson, Appellants,

v.

The STATE of Oklahoma, Appellee.

Nos. M–80–326, M–80–377 and M–80–328.

Court of Criminal Appeals of Oklahoma.

June 22, 1983.

As Corrected July 22, 1983.

Robert D. Nelson, Roy J. Davis, Andrews, Davis, Legg, Bixler, Milsten & Murrah, for appellants, Stahl, Collard and Kelly.

Robert Hager, Tulsa, for appellant Vicki Monks.

Louis W. Bullock, Sobel, Moran, Bullock & Stevens, Tulsa, for appellants Bernstein, Emerson, McDaniel, Nixon and Wolfson.

Jack C. Landau, Sharon P. Mahoney, Clemens P. Work, Washington, D.C., James P. Kelley, Oklahoma City, for amicus.

Jan Eric Cartwright, Atty. Gen., State of Okl., David W. Lee, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

Appellants are nine newspersons convicted in a non-jury trial of Trespass after Being Forbidden, in violation of 21 O.S. 1971, § 1835. Each was fined $25.00.

The pivotal issue in this appeal is whether the First Amendment shields newspersons from state criminal prosecution in their news gathering function. We hold that it does not.

Black Fox Station is a 2,206 acre tract of land in Rogers County, Oklahoma, owned by the Public Service Company of Oklahoma (PSO), an Oklahoma corporation. PSO and two rural electric cooperatives, Associated Electric Cooperative, Inc. (Associated) and Western Farmers Electric Cooperative (Western), agreed to develop nuclear power generating facilities on the site. Some initial excavation and construction work was commenced under a limited work authorization issued by the Nuclear Regulatory Commission.

On June 2, 1979, members of the Sunbelt Alliance, a group whose goal it was to display their opposition to the proposed nuclear facility, occupied the grounds at Black Fox. The appellant newspersons crossed the fence with the protestors, despite PSO's previously announced intention to have such persons arrested, and despite signs posted on the fence and loudspeaker warnings. All 339 demonstrators and the nine appellants were arrested and booked by the Rogers County sheriff.

It is argued that appellants lacked the requisite criminal intent since they entered the land only to gather news, not to violate the rights of the landowners or engage in other unlawful behavior. It is also argued that appellants must be shown to have actually caused significant damage to a real property interest, or a breach of the peace to be guilty of the offense of trespass.

Title 21 O.S.1981, § 1835(a) provides:

Whoever shall willfully or maliciously enter the garden, yard, or enclosed field of another after being expressly forbidden to do so by the owner or occupant thereof shall be deemed guilty of trespass and upon conviction thereof shall be fined in any sum not to exceed Twenty-five Dollars ($25.00); provided, that anyone who willfully or maliciously enters any such garden, yard, or field, and therein commits or attempts to commit waste, theft, or damage shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not less than Fifty Dollars ($50.00) nor more than Five Hundred Dollars ($500.00), or by confinement in the county jail for not less than thirty (30) days nor more than six (6) months, or both such fine and imprisonment.

Regarding the requisite mens rea, the word "willfully" is defined as follows:

The term "willfully" when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act or the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.

Title 21 O.S.1981, § 92. It is thus manifest that appellants need not have intended to violate any laws or injure the landowner in order to have committed trespass. Moreover, it is apparent that actual damage is not an element of the offense under the first part of § 1835(a). Trespass resulting in waste, theft or damage is treated separately in the proviso, and is subject to a greater range of punishment.

Appellants contend that these convictions are in violation of the First and Fourteenth Amendments to the United States Constitution. To sustain such a claim, a showing of government action, state or federal, is necessary.

We do not agree with our dissenting colleague that the validity of these convictions under the Oklahoma Constitution is properly before this Court. Any such claim has been waived in the briefs. Only one of the nine appellants makes any contention in this regard, and that by the obscure statement that the convictions violate the First Amendment "and the cognate provisions of the Oklahoma Constitution". Reply Brief of Appellant Monks, p. 33. Appellants' statement of the issue and the authority relied upon are grounded solely on the First Amendment.

However, the dissent does not differentiate under the facts of this case the protec-

tions provided by the Oklahoma Constitution from those provided by the First Amendment. Rather, the rights guarded are treated as co-extensive, with First Amendment caselaw controlling. Thus, the difference in results is not due to analysis under one constitutional provision instead of the other.

The trial court found that a sufficiently close nexus existed between the actions of PSO and the state and federal governments to fairly treat the actions of PSO as the actions of government itself. See *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The trial court further found that PSO's partners in the project, Associated and Western, were instrumentalities of the federal government, and that PSO acted on behalf of the partners. See, *Alabama Power Company v. Alabama Electric Cooperative, Inc.,* 394 F.2d 672 (5th Cir.1978), cert. den., 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465, (rural electric cooperatives are federal instrumentalities under the anti-trust laws). But see, *City of Paris, Kentucky v. Federal Power Commission,* 399 F.2d 983 (D.C.Cir.1968) (rural electric cooperatives are not federal instrumentalities under the federal power act).

The State does not challenge these findings. It is unnecessary for us to determine whether state action is present in each of these forms since the constitutional claim is unavailing on its merits. Appellants urge that they have been denied their constitutional right to gather the news. They argue that they had a constitutional right to cross the fence and accompany the protestors in order to adequately cover the event absent a sufficient countervailing state interest.

On June 2, 1979, the grounds of Black Fox were closed to both press and public, except for a designated public viewing area (PVA) near the center of the site. PSO's general policy was that persons desiring to visit the site must enter at one of the gates. The visitor could then proceed directly to the PVA, or request permission to visit other portions of the site. Such permission

normally involved an escort for the visitor while on the grounds. Those violating the policy by entering the property through the fence were subject to arrest.

The policy was based on the need to avoid harm to visitors due to ditches and holes on the property and the roads. There was also the danger posed by heavy equipment utilized in construction activity on the site. An additional factor leading to this policy was the need to avoid vandalism to the site and to the heavy equipment kept therein.

■ Although there is evidence that the overall PSO press arrangements for the June event were based in part on a desire to minimize the effectiveness of the demonstration these newspersons were arrested for crossing the fence and entering the grounds in violation of a policy supported by valid considerations. Governmental entities are empowered to regulate property under their control in order to preserve the property for the use to which it is lawfully dedicated. *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976); *Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The basic function of the Black Fox Station was to house nuclear power generating facilities. In order to efficaciously administer the property, PSO needed to regulate the entrance of visitors to the facility.

■ The First Amendment does not shield newspersons from liability for torts and crimes committed in the course of news-gathering. See *Galella v. Onassis,* 487 F.2d 986 (2nd Cir.1973); *Dietemann v. Time, Inc.,* 449 F.2d 245 (9th Cir.1971); *Anderson v. WROC–TV,* 109 Misc.2d 904, 441 N.Y.S.2d 220 (1981); *Prahl v. Brosamle,* 98 Wis.2d 130, 295 N.W.2d 768 (1980). In *Le Mistral, Inc. v. Columbia Broadcasting,* 61 A.D.2d 491, 402 N.Y.S.2d 815, 817 (1978), the court reviewed the applicable law:

In *Dietemann v. Time, Inc.,* 449 F.2d 245, 249 (9th Cir.1971), it was observed that '[t]he First Amendment has never been construed to accord newspersons immunity from torts or crimes committed during the course of newsgathering. The First

Amendment is not a license to trespass ...' Similarly, the Second Circuit Court of Appeals in *Galella v. Onassis,* 487 F.2d 986, 995–996, stated:

'Crimes and torts committed in news gathering are not protected. See *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); *Dietemann v. Time, Inc.,* 449 F.2d 245, 249–250 (9th Cir.1971). See RESTATEMENT OF TORTS 2d § 652(f), comment K (Tent. Draft No. 13, 1967). There is no threat to a free press in requiring its agents to act within the law."

▆ Further, the First Amendment does not guarantee the press a constitutional right of special access not available to the public generally. *Branzburg v. Hayes,* 408 U.S. 665, 684, 92 S.Ct. 2646, 2658, 33 L.Ed.2d 626 (1972); *Houchins v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1977) (Burger, C.J.; and Stewart, J., concurring in the judgment); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Moreover, this property is not a traditional public forum such as public streets, sidewalks, and parks, and there is no constitutional guarantee of access:

[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government. In *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Court cited approvingly from its earlier opinion in *Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) wherein it explained that 'The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505.

*U.S. Postal Service v. Council of Greenburgh Civic Associations,* 453 U.S. 114, 129–130, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981).

Appellants were subjected to a rule of access applying to both press and public alike. This rule was supported by suffi-cient policy considerations. The judgments and sentences are AFFIRMED.

BUSSEY, P.J., concurs.

BRETT, J., dissents.

BRETT, Judge:

I respectfully dissent to this decision.

The appellants in Case No. M–80–326, Stahl, et al., (Consolidated Cases CRM–79–407, 512, 635), Case No. M–80–328 Bernstein, et al., (Consolidated Cases CRM–79–373, 407, 437, 512, 540, 547, 561, 635, and 681 and Case No. M–80–377, Monks, et al., (Consolidated Cases CRM–79–373, 407, 437, 512, 540, 547, 561, 635 and 681), are nine newspersons who were convicted of the misdemeanor offense of Trespassing After Being Forbidden, in violation of 21 O.S.1971, § 1835, in the District Court of Rogers County before the Honorable David Allen Box, without a jury. The nine cases were consolidated for trial and each appellant received a twenty-five ($25) dollar fine. It is from this conviction for criminal trespass that the nine appellants herein appeal.

The criminal trespass statute in question provides:

Whoever shall willfully or maliciously enter the garden, yard, or enclosed field of another after being expressly forbidden to do so by the owner or occupant thereof shall be deemed guilty of trespass and upon conviction thereof shall be fined in any sum not to exceed Twenty-five ($25.00) dollars.

The appellants argued below and appealed to this Court that their convictions under the statute violated the First and Fourteenth Amendment of the U.S. Constitution and Article II, Sec. 22 of the Oklahoma Constitution by abridging their right of access of freedom of the press. Mindful of the federal guarantee of the appellants' free press rights, it is unnecessary to address it to decide this case because I believe the appellants' criminal convictions, under the facts and circumstances of this case,

violate the guarantee of freedom of the press as found in our state constitution.[1]

This case arose when the Sunbelt Alliance, an anti-nuclear organization, planned a demonstration for June 2, 1979, to protest the construction of the Public Service Co. of Oklahoma's Black Fox Station Nuclear Power Plant, located in Rogers County, Oklahoma (hereinafter PSO). The Black Fox Station had been the scene of a prior protest in October of 1978.

Because PSO offices were dissatisfied with press coverage of the October, 1978, protest, they made provisions to handle press coverage of the June 2nd protest by designating that news media persons would be confined to a public viewing area located inside the proposed nuclear site. The Black Fox site covers 2,220 acres and the designated press area was located on a 2½ acre plot near the center of the site. Prior to designating this press site, neither PSO nor the appellants knew where the demonstrations would occur on the site.

On the morning of the demonstration, 339 demonstrators, in protest of building the proposed nuclear plant, crossed the perimeter fence and entered the property occupied by PSO. The nine appellant newspersons also crossed the fence and followed the demonstrators to observe and report the events that transpired. The newspersons violated PSO's rule that the press would be permitted only in the public viewing area. The demonstrators and the newspersons were met at the site by sheriffs in mobile booking vans who warned them to halt or be arrested. The appellants ignored the warning and were arrested for unlawful entry. The newspersons entered the site for the avowed purpose of covering the demonstration for the public. They did not demonstrate, nor interfere with PSO's construction activities, nor cause any harm to the nuclear plant. They also did not interfere with the policemen's booking and arrests of the protestors.

The major question on appeal is whether the State's criminal trespass statute can be used to punish newspersons for peacefully entering upon quasi-public property during a political demonstration in order to bring newsworthy events occurring on that property to the public's attention. Central to this question is, if our criminal trespass statute can be so used, under what conditions may the State constitutionally exercise this power and were these conditions met under the circumstances of this case? Surprisingly, this precise issue has not been litigated. However, because of the importance of this issue and the inevitability of its reoccurrence, considering today's era of increasing political activities with interested groups conducting unauthorized demonstration on public and private property, I disagree with the manner in which my colleagues solve the constitutional questions presented as they relate to a free press. To resolve this case, I believe two questions must be answered: (1) whether the right of the press to go on quasi-public property to cover an ongoing political demonstration is in technical violation of our criminal trespass statute, and (2) whether enforcement of our criminal trespass statute against newspersons under the circumstances of this case is foreclosed by the free press clause of our State constitution.

I begin my analysis by acknowledging and adopting all of the trial court's findings of fact and conclusions of law. These are:

(1) The property located at Black Fox Station is an enclosed field within the meaning of the Oklahoma Criminal Trespass Statute.

(2) The actions of PSO at the Black Fox Station on June 2, 1979, to which the appellants herein objected, are considered State action for purposes of analysis under the First and Fourteenth Amendment of the U.S. Constitution and Article II, subsections 2, 7, and 22 of the Oklahoma Constitution.

(3) The significant public controversy concerning whether a nuclear power

---

1. In pertinent part, that Article provides "No law shall be passed to restrain or abridge the liberty of speech or of the press." Okl. Const. Art. II, § 22.

plant should be built and operated at Black Fox and the June 2, 1979, protest of construction of said facilities were newsworthy events.

(4) Based on the orderly and peaceful conduct of newspersons at the October, 1978, political protest at Black Fox, PSO had no reason to believe newspersons would interfere with the demonstrators or do any harm to the Black Fox Station at the June 2 protest.

(5) PSO had been unhappy with press coverage of the October, 1978, protest and wished to limit press coverage of the June 2, 1979, protest to those specific events which could be viewed from outside the perimeter fence and from the designated public viewing area inside the fence.

(6) The purpose for limiting such press access was to prevent the protestors from "collecting publicity" based on PSO's belief that the demonstration did not deserve the kind of importance or legitimacy that debate and news coverage would give it. Accordingly, PSO sought to prevent newspersons from interviewing the demonstrators and from taking "close up" and "battle shots" of the marchers.

(7) Prior to crossing the boundary fence, the appellants observed posted signs which warned them that entry without permission was under penalty of law. After crossing the fence, appellants failed to heed an official announcement that they were on private property and subject to arrest.

(8) Only the appellant newspersons who crossed the perimeter fence with the demonstrators could observe the protestors' first encounter with the sheriff and the first arrest since these events could not be observed from outside the perimeter fence or from the designated public viewing area.

(9) Some of the appellants and their employers published news stories about the June 2, 1979, demonstration, that included video and/or verbal descriptions of, among other things, the protestors' initial encounter with the sheriffs and the arrests.

(10) There were no unusual hazards to the appellants' safety on the Black Fox site on June 2, 1979.

(11) The appellants did not interfere with any construction activity or cause any physical harm to the Black Fox Station on June 2, 1979.

(12) The appellants did not interfere with the booking procedure or the sheriff's arrests of the protestors on June 2, 1979.

(13) The appellants crossed the fenced boundary line at Black Fox Station solely to cover the protest as newspersons, not to demonstrate against nuclear power or PSO's plans to build a nuclear facility at Black Fox.

(14) Based on decisions of the United States Supreme Court, lower Federal courts, and the Oklahoma Supreme Court, as a matter of law, there is a First Amendment right of the news media to reasonable access to the news such as is available to the public generally. The press, engaged in the process of gathering news and information for public distribution, may claim constitutional protection for its actions.

Based on this background of findings of fact and conclusions of law, my first inquiry is whether appellants were in technical violation of the criminal trespass statute. Our statute has not been construed in the context of reporters who passively enter quasi-public property in their newsgathering function and remain on the property after being requested to leave. However, our criminal trespass statute has been construed as it relates to trespassing persons of the public generally. *Lambert v. Rainbolt,* 207 Okl. 451, 250 P.2d 459 (Okl.1952); *Farmer v. State,* 508 P.2d 1114 (Okl.Cr.1973); *Guindon v. State,* 627 P.2d 449 (Okl.Cr.1981).

From these cases, it follows that the essential element of a criminal trespass offense is failure to halt or leave after being requested to do so by the owner or occupant. In the case at bar, the appellant newspersons failed to heed several warnings that their continued presence on the Black Fox site would result in their arrest. I must thus conclude their intrusion was unwarranted, constituted an illegal trespass and violated the statute.

Having decided that appellants violated the criminal trespass statute, my second inquiry is whether enforcement of the statute against newspersons, under the circumstances of this case, violated the free press clause of our State constitution. We have had many occasions to interpret our constitution's free press, free speech clause as against State statutes and city ordinances which sought to restrict these freedoms. In three of the first cases to come before this Court, we addressed the constitutionality of city ordinances that forbid pamphleteering on public streets. *Ex Parte Walrod,* 79 Okl.Cr. 299, 120 P.2d 783 (Okl.Cr.1941); *Ex Parte Winnett,* 73 Okl.Cr. 332, 121 P.2d 312 (Okl.Cr.1942); *Emch v. City of Guymon,* 75 Okl.Cr. 1, 127 P.2d 855 (Okl.Cr.1942). In these cases we stated that: " 'Freedom of the press' as guaranteed by constitutions, Federal and State ... contemplates not only the right to print, but also the right to distribute. The power of municipalities to enact regulations in the interest of public safety, health and welfare or convenience, may not be so employed as to abridge the individual liberties secured by the constitution to those who wish to speak, write, print or circulate information or opinion."

This Court further interpreted our free speech, free press constitutional provision in *Lyles v. State,* 330 P.2d 734 (Okl.Cr.1958), when we upheld a trial court's decision to permit television cameras in the courtroom during a criminal trial. In speaking of free press, free speech rights in that case, we stated:

This [right] belongs to every person. Under our constitution, the [right] may be freely used so long as it is not improperly

exercised. No one can deny the long established right of the press in the United States to gather and disseminate news and information concerning every phase of human activity, together with the incidents pertaining thereto. This [right] makes the press the most potent servant of the people in protecting all rights against acts of tyranny, fraud, and corruption, as well as a most prolific medium of information and education. We are of the opinion that freedom of speech and press is not a discriminate right but the equal right of newsgathering and disseminating agencies, subject to the restrictions against abuse, and injurious use to individuals or public rights and welfare. *Id.* at 739.

In addition to these pertinent state court decisions cited, the United States Supreme Court has addressed the issue of right to press access to newsworthy events in light of significant cases. *Zemel v. Rush,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179, reh'g. denied, 382 U.S. 873, 86 S.Ct. 17, 15 L.Ed.2d 114 (1965); *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Oklahoma Publishing Co. v. District Court of Oklahoma County,* 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977); *Houchin v. KQED, Inc.,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978); *Gannett Co., Inc. v. De Pasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980).

While none of these federal cases are factually analogous to the instant case, in that none of them involved the State's use of a criminal trespass statute to deny press access, the cases are instructive in helping us decide the instant case because of the method the court used in reaching their decisions. To resolve the conflicting interests presented in each case, the court weighed the value of the asserted First Amendment rights against the objective of

the government conduct that limited the right. The court recognized the value of a free press in a democratic society and reaffirmed the belief that press access to newsworthy events ensured the public would have a "free marketplace of ideas where debate on public issues would be uninhibited, robust and wide open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

When I read in context all the press access cases decided by the United States Supreme Court, I find they hold that any press access claim to government information is subject to a degree of restraint dictated by the kind of forum, the nature of the information sought and the countervailing governmental interests. The claims are analyzed by balancing these three factors.

Our State court opinions have followed this same analysis. Although we are not bound by the United States Supreme Court decisions in interpreting the scope of our State Constitution free press clause, I find no tenable ground for not following the balancing guidelines laid down by the United States Supreme Court cases cited. Accordingly, I would hold that our State Constitution gives protection for the rights of the press to reasonable access to gather news and any restraint on this right, including but not limited to enforcement of a criminal trespass statute, requires that the State show a relatively greater consideration that must be exercised in the public interest. A balancing of these opposing interests is thus mandated.

In determining the standard used to weigh the interests involved, Courts have considered the purpose and motive behind the abridging action. If, in a particular case, it is found that the purpose behind the State action is not legitimate, and is designed solely to penalize, control or limit speech or press rights, the State must show substantial justification for their actions before the restriction will be upheld. See *Grosjeon v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); *Gomillion v.*

*Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958).

It is against this backdrop of constitutional principles and weighing standards that I now proceed to perform the "delicate and difficult" task of weighing the circumstances and apprising the substantiality of the reasons advanced by the State in determining the press' right of access under the circumstances of this case.

I begin by addressing appellant's argument that the open fields at the proposed nuclear site was considered a traditional First Amendment forum and subject only to reasonable time, place and manner restrictions. I do not agree. Traditional public forums as parks, streets and sidewalks are exclusively publicly owned and supported. Black Fox Station was not imbued with this type of public character. PSO, as majority owner of the station, was a private corporation with a substantial financial investment in the project. The government subsidies infused in the program were more in the nature of promotional incentives than proprietary acts denoting incidents of public ownership. I am bound to find, however, that Black Fox's open fields had a quasi-public character and conclude, as did the trial court, that PSO's actions there would be held to be State action for purposes of First Amendment analysis. We find State action exists not only because the station received extensive government subsidies but also because it had monopoly status, was heavily regulated by the State, and the minority owners were instrumentalities of the United States.

Having decided that Black Fox's open fields do not qualify for the stringent weighing standards of time, place, and manner regulations, I turn then to the other weighing standard which is based on the historical and practical justifications each side presents to support their position. In using this balancing test, the total circumstances must be considered.

On the press's side of the scale is the media's newsgathering right to reasonable

access to newsworthy events. This right is constitutionally protected. It is premised on the significance of a free press for the maintenance of our political system. See *Richmond, Gannett, Saxbe, Branzburg,* and *Houchin,* supra. It is an ·uncontroverted fact that the news media is an integral part of our national communication system by which the public obtains information to form their judgments about national politics. The press has a constitutionally recognized role to inform and educate, offer criticism and provide a forum for public discussion and debate.

In assessing a First Amendment press access claim, we use the qualifying test of looking at historical practice, the specific structural value of the claim in the circumstances and the kind of information the press seeks as against the State interests invaded. *New York Times Co. v. Sullivan,* supra, 376 U.S. at 270, 84 S.Ct. at 720; *Richmond,* supra, 100 S.Ct. at 2842 (Marshall, J. and Brennan, J. concurring.) In assessing the press access claim in this case, I make three important observations: First, the nuclear power demonstration at Black Fox was a newsworthy event and media coverage of it was at the very core of the protection afforded by the First Amendment. Second, press access to this newsworthy event was not reasonable because the press was designated a specific area to be on the site before the demonstration began when it could not have been known where the demonstration would take place. This kind of prior restraint has been deemed to be presumptively invalid. And third, the information the press sought was about the operation of the government and this type of information the public had a deserved right to know.[2]

On the State's side of the scale, they justify enforcing the criminal trespass statute against newsmen for two reasons: (1) to maintain order and (2) to protect property interests. The State urges us to recognize the public utility of their actions as a valid exercise of their police powers. That the State, under the police powers, may maintain order and protect property interests, is not denied as a general statement. But in accomplishing these objectives, do the State's police powers extend so far as to restrict or totally subvert press access to a newsworthy event? The determination of that question begins with the observation that the usual presumption favoring statutory validity is not operative against restrictions of pre-eminent freedoms secured by our State Constitution and the First Amendment of the U.S. Constitution. These liberties are given a priority that does not permit dubious intrusion. Accordingly, any attempt to restrict them must be justified by a clear public interest that is presently threatened by the activity sought to be regulated.

The State claims the threatened public interest in this case was that of public safety. It argues that the demonstrators' mass act of civil disobedience presented the possibility of a hostile and violent confrontation with unknown consequences. This justification may have been a proper consideration for the 300 demonstrators that threatened the public peace with their unauthorized march. But this justification could scarcely be applicable to the nine newspersons who came and left peacefully with the demonstrators and were not involved in anything other than the gathering of the news. The political demonstration at Black Fox was not classified as a "scene of a crime or other disaster" that understandably would warrant exclusion of the press for safety or security reasons. The record does not support the contention that the newspersons' physical safety was endangered. Quite the contrary, the trial court specifically found that there were no dangers to anyone on the site and the demonstration was peaceful and orderly. It could be argued that the presence of the press, by assuring full public accountability, dimin-

---

2. *Richmond,* supra, 100 S.Ct. at 2842 (Blackmun, J., concurring)

The public has an intense need and a deserved right to know about the administration of justice in general ... about the conduct of other public servants, and all actors in the judicial arena.

ished the possibility of a violent confrontation and very possibly assured that everything remained peaceful. Moreover, the United States Supreme Court has held that "mere speculation of harm does not constitute a compelling State interest." *Consolidated Edison Co. of New York v. Public Service Co.,* 447 U.S. 530, 542, 100 S.Ct. 2326, 2336, 65 L.Ed.2d 319 (1980).

I next address the State's argument that the press was not denied reasonable access because, in their assessment, the events that transpired prior to the demonstrators' arrest had no special newsworthy significance. The State's conclusion on this issue is constitutionally impermissible. No court or government official can make the determination of what is a significant newsworthy event. Chief Justice Burger, writing in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730, stated:

> The choice of material to go into a newspaper and the decision made as to ... content and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It is yet to be demonstrated how governmental regulation of this crucial process can be exercised with First Amendment guarantees of a free press as they have evolved to this time.

See also *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 124–125, 93 S.Ct. 2080, 2097, 36 L.Ed.2d 772, (1973) where the court held that editors, newspapers, and broadcasters have the power to select and choose news material. I am of the opinion that the people themselves are the final masters of what news they consume since they have the most effective tools to make that choice through selective reading, listening and T.V. viewing. Government officials do not have the function of news censoring in a republic society even if there were no First Amendment. I sanction James Madison's view that "censorial power is in the people over the government, and not in the government over the people." 4 Annals of Congress 934 (1794).

I next consider the State's justification for their action as that of protecting PSO's property rights. Protecting property in an orderly society is of the highest importance. But in this case, the trial court's finding of fact did not support the view that PSO's property interests were imperiled by the newspersons. The trial court found that PSO had no reason to believe and they did not believe that the newspersons at the June 2 demonstration would do any harm to the site or damage any of their facilities. PSO was secure in this belief based on the press's orderly and peaceful actions at the political demonstration held on the site in October, 1978. Based on those uncontroverted facts, I do not find the State's justifying reason of protecting property interests a persuasive argument. It is also not supported by the trial court's own findings of fact.

I do not intimate that a private person may not be secure in his property rights on his private property. But the property interest sought to be protected here had a quasi-public character. Property interests on quasi-public property are not absolute. These interests must be exercised for the convenience of all and must not, in the guise of regulation, totally abridge free speech and free press rights. *Hague v. Cio,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

And finally, I address the motive and purpose behind the State's abridging action. The trial court specifically found that PSO's reasons for limiting press coverage was for the illegitimate purpose of controlling the kind of news story the press would later distribute to the public. The trial court commendably decided that such action was objectionable, ignorable, and incompatible with the rights of a free people. But after correctly making this assessment, the trial court regrettably failed to place the proper weight on this objectionable action. The United States Supreme Court has consistently held that no regulation, even under time, place and manner restrictions, can be based on the content of the expression. It

is well settled that the government cannot prohibit communication merely because they disapprove of the speaker's views. *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *Garrett v. Estelle,* 424 F.Supp. 468 (N.D.Tex.1977); *McHealthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *Grosjean v. American Press Co.,* supra, (1936).

In the instant case, the trial court did not give PSO's improper motives the critical scrutiny demanded under our state constitutional free press clause or under accepted first amendment principles. Given PSO's deliberate attempt to limit press access based on their disapproval of the message the media would convey to the public and PSO's use of the criminal trespass statute to accomplish their goal, I would hold the State has not presented a legitimate interest for their inhibiting actions. I would not permit our criminal trespass statute to be used illegitimately and in this manner in order to prevent the public from knowing what their government is doing on quasi-public property. It is inconceivable to me that a contrary conclusion could be sanctioned in our democratic society.

I do not say that the press has an absolute right to go on public property to gather news. I would only hold that our criminal trespass statute cannot be used arbitrarily and unreasonably to exclude the press from their constitutionally protected news gathering role on public property when the State does not present a legitimate or important countervailing interest. The press remains subject to reasonable time, place and manner restrictions when exercising its news gathering role in traditional First Amendment forums and subject to the weighing tests discussed herein when making a press access claim to non-traditional public forums. I would reaffirm the holding in *Central Liquor Co. v. Oklahoma Alcoholic Beverage and Control Board,* 640 P.2d 1351 (Okl.1980), where the State Supreme Court stated: "Police power must be exercised in the public interest with scrupulous concern for private rights guaranteed by the Constitution. It may not be utilized for the benefit of a private company." I agree that the power of the State must be protected but it must not be abused.

I have thoroughly considered the justifications given by the State for their inhibiting actions and conclude that these justifications are not outweighed by the press's claim of reasonable access to the newsworthy event in this circumstance. I would also find that the State's justifications are not supported by the trial court's findings of fact. I would further find that the State's denial of press access in this case was for the illegitimate purpose of controlling the news and thus no legitimate state interest was being served.

In sum, I believe that the restrictions on the press by enforcing the criminal trespass statute against the newsmen under the circumstances of this case was destructive of the right of a free press to gather news when the State did not have a greater, substantial or legitimate interest to be served. I would hold that this State action is incompatible with the free press freedoms as secured by Article II, Section 22 of our State Constitution. Accordingly, I believe the prosecutions of the appellant newspersons were unjustified and the judgment of the trial court should be Reversed. Therefore, I dissent to this decision.